UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

**JUDY POLLER**,

              *Plaintiff and Counterclaim Defendant*,

    *-against-*

**BIOSCRIP, INC.**,

              *Defendant and Counterclaim Plaintiff*,

           Case No. 1:11-cv-01675 (JPO)

    *-against-*

**AMERICAN OUTCOMES MANAGEMENT, L.P.**,

              *Counterclaim Defendant.*

_____


## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT OF
## JUDY POLLER AND AMERICAN OUTCOMES MANAGEMENT, L.P.


**HISCOCK & BARCLAY, LLP**
Brian E. Whiteley
Carolyn A. Marcotte
One International Place, 26th Floor
Boston, Massachusetts 02110
Telephone:  (617) 274-2900
Facsimile:   (617) 722-6003

*Attorneys for Plaintiff and Counterclaim*
*Defendant Judy Poller*
*And Third-Party Defendant*
*American Outcomes Management, L.P.*

# TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES** ................................................................. iii

**PRELIMINARY STATEMENT** ........................................................... 1

**STATEMENT OF MATERIAL FACTS** ............................................... 3

    I.    THE PARTIES AND RELEVANT SERVICES ................................... 3

        A.    AOM and Poller ................................................................. 3

        B.    BioScrip ............................................................................ 4

        C.    The Relevant Products and Services ....................................... 4

    II.    POLLER'S WELL-ESTABLISHED EMPLOYMENT HISTORY IN THE HEALTHCARE INDUSTRY PRIOR TO BIOSCRIP ............................. 5

    III.    POLLER'S EMPLOYMENT HISTORY AT BIOSCRIP ...................... 5

        A.    For the Majority of Her Tenure at BioScrip, Poller Did Not Have a Restrictive Covenant Agreement ................................... 5

        B.    BioScrip's Requirement That Poller Sign a Non-Compete and Non-Solicitation Agreement as a Condition of Continued Employment ........................................................................ 7

        C.    Changes in the Terms and Conditions of Poller's Employment ............... 7

    IV.    POLLER'S DECISION TO LEAVE BIOSCRIP ................................. 8

**PROCEDURAL HISTORY** .................................................................. 9

**ARGUMENT** .................................................................................. 10

    I.    RELEVANT STANDARDS AND CHOICE OF LAW ...................... 10

        A.    The Summary Judgment Standard ........................................ 10

        B.    Choice of Law .................................................................. 10

    II.    THE RCA IS UNENFORCEABLE BECAUSE IT DOES NOT REASONABLY PROTECT BIOSCRIP'S LEGITIMATE INTERESTS WHEN APPLIED TO POLLER ................................. 12

III.    THE COMMON LAW BREACH OF FIDUCIARY DUTY AND LOYALTY CLAIMS MUST BE DISMISSED BECAUSE THERE IS NO EVIDENCE OF BREACH ........................................................................ 16

IV.    THE COMPUTER FRAUD AND ABUSE ACT CLAIM FAILS BECAUSE POLLER'S ACCESS WAS AUTHORIZED AND WITHOUT AN INTENT TO DEFRAUD ............................................................ 17

V.    BIOSCRIP DOES NOT HAVE SUFFICIENT EVIDENCE TO PURSUE ITS UNFAIR COMPETITION CLAIMS ........................................... 18

VI.    BIOSCRIP'S MISAPPROPRIATION OF TRADE SECRETS CLAIM FAILS BECAUSE THIS COURT HAS ALREADY FOUND THE INFORMATION AT ISSUE WAS NOT CONFIDENTIAL – LET ALONE A TRADE SECRET .............................................................................. 19

VII.    AN UNJUST ENRICHMENT CLAIM MUST BE DISMISSED WHEN A CONTRACT GOVERNS THE RELATIONSHIP BETWEEN THE PARTIES ................................................................................. 20

VIII.    BIOSCRIP'S INTERFERENCE CLAIMS FALTER BECAUSE REFERRAL SOURCES AND PATIENTS ARE NOT BOUND TO USE BIOSCRIP AND BIOSCRIP CANNOT SHOW MALICIOUS CONDUCT ........................................................................................................ 21

IX.    NEW YORK'S CONSUMER PROTECTION LAW DOES NOT APPLY TO A PRIVATE DISPUTE SUCH AS THIS ONE ............................... 22

X.    BIOSCRIP'S REQUEST FOR PERMANENT INJUNCTIVE RELIEF SHOULD BE DISMISSED FOR THE SAME REASONS THIS COURT REJECTED THE REQUEST FOR PRELIMINARY RELIEF ............ 23

XI.    PUNITIVE DAMAGES ARE NOT WARRANTED .......................................... 24

**CONCLUSION** ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page**

*Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429 (S.D.N.Y. 2011) ........................... 20

*BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 690 N.Y.S.2d 854 (1999) ................................ 12, 13

*Beard Research, Inc. v. Kates*, 8 A.3d 573 (Del. Ch. 2010) ...................................... 16

*CA, Inc. v. Simple.com, Inc.*, 621 F. Supp. 2d 45 (E.D.N.Y. 2009) ............................ 18

*Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115 (2d Cir. 2008) ........................ 21

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986) ................................. 10

*Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653 (1987) ............. 20

*Dickerson v. Napolitano*, 604 F.3d 732 (2d Cir. 2010) .............................................. 10

*Elite Cleaning Co., Inc. v. Capel*, No. 690-N, 2006 Del. Ch. LEXIS 105 (Del. Ch. Ct. June 2, 2006) ......................................................................................... 12, 14

*Fabiano v. Philip Morris Inc.*, 54 A.D.3d 146, 862 N.Y.S.2d 487 (1st Dep't 2008) ................. 24

*Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386 (2d Cir. 2001) ........................... 11

*FTI Consulting, Inc. v. Graves*, No. 05 Civ. 6719 (NRB), 2007 U.S. Dist. LEXIS 55325 (S.D.N.Y. July 30, 2007) ................................................................... 14

*Gemmy Indus. Corp. v. Chrisha Creations Ltd.*, No. 04 Civ. 1074, 2004 U.S. LEXIS 11468 (S.D.N.Y. June 23, 2004) ................................................................ 19

*Gilman & Ciocia, Inc. v. Randello*, 55 A.D.3d 871, 866 N.Y.S.2d 334 (2d Dep't 2008) ................................................................................................... 12

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549 (2d Cir. 2000) .............................................................................................. 11

*Hicks v. Baines*, 593 F.3d 159 (2d Cir. 2010) ....................................................... 10

*Icy Splash Food & Beverage v. Henckel*, 14 A.D.3d 595, 789 N.Y.S.2d 505 (2d Dep't 2005) .............................................................................................. 23

*Innoviant Pharm., Inc. v. Morganstern*, 390 F. Supp. 2d 179 (N.D.N.Y. 2005) ...................... 11

*Jet One Group, Inc. v. Halcyon Jet Holdings, Inc.*, No. 08 Civ. 3980 (JS), 2009 U.S. Dist. LEXIS 72579 (E.D.N.Y. Aug. 14, 2009) ......................................................... 17

*Kaye v. Grossman*, 202 F.3d 611 (2d Cir. 2000) ..................................................... 20

*Kirch v. Liberty Media Corp.*, 449 F.3d 388 (2d Cir. 2006)....................................................21

*Kulak v. City of New York*, 88 F.3d 63 (2d Cir. 1996)..............................................................10

*Kwan v. Schlein*, 441 F. Supp. 2d 491 (S.D.N.Y. 2006)............................................................18

*LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009)................................................17

*Maier-Schule GMC v. General Motors Corp.*, 850 F. Supp. 1095 (W.D.N.Y. 1994)................23

*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 919 N.Y.S.2d 465 (2011) ..................20

*Matter of Allstate Ins. Co.*, 81 N.Y.2d 219, 597 N.Y.S.2d 904 (1993) .....................................11

*Metito (Overseas) Ltd. v. GE*, No. 05 Civ. 9478, 2009 U.S. Dist. LEXIS 12590
(S.D.N.Y. Feb. 18, 2009)......................................................................................................20, 21

*North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38 (2d Cir. 1999)....................................19

*Orbit One Commc'ns, Inc. v. Numerex Corp.*, 692 F. Supp. 2d 373 (S.D.N.Y. 2010)...............17

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20,
623 N.Y.S.2d 529 (1995)..........................................................................................................23

*P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC*, 428 F.3d
504 (3d Cir. 2005)......................................................................................................................17

*Pacheco v. United Med. Assoc., P.C.*, 305 A.D.2d 711, 759 N.Y.S.2d 556 (3d Dep't
2003) ......................................................................................................................................21, 22

*Paper Corp. of U.S. v. Schoeller Technical Papers, Inc.*, 759 F. Supp. 1039 (S.D.N.Y.
1991) ............................................................................................................................................18

*Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98 (2d Cir. 1997) .............................................10

*Prozeralik v. Capital Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 605 N.Y.S.2d 218
(1993)...........................................................................................................................................24

*Reed, Roberts Assocs., Inc. v. Strauman,* 40 N.Y.2d 303, 386 N.Y.S.2d 677 (1976) ................19

*Research & Trading Corp. v. Pfuhl*, No. 12527, 1992 Del. Ch. LEXIS 234 (Del. Ch.
Ct. Nov. 18, 1992)............................................................................................................11, 12, 13

*RHIS, Inc. v. Boyce*, No. 18924, 2001 Del. Ch. LEXIS 118 (Del. Ch. Ct. Sept. 26,
2001) ......................................................................................................................................12, 14

*Rocanova v. Equitable Life Assurance Soc. of U.S.*, 83 N.Y.2d 603, 612 N.Y.S.2d 339
(1994)...........................................................................................................................................24

*Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 836 N.Y.S.2d 509 (2007)................................24

*Sapp v. Casey Employment Servs.*, No. 10781, 1989 Del. Ch. LEXIS 150 (Del. Ch. Ct. Nov. 3, 1989).................................................................................................... 12

*Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037 (2d Cir. 1980)....................................... 18

*Scott, Stackrow & Co., CPA's, PC v. Skavina*, 9 A.D.3d 805, 780 N.Y.S.2d 675 (3d Dep't 2004) ................................................................................................................... 14

*Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 831 N.Y.S.2d 760 (2007) ......................................... 20

*State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158 (2d Cir. 2004) ............................................................................................................................ 21

*Stutman v. Chemical Bank*, 95 N.Y.2d 24, 709 N.Y.S.2d 892 (2000)........................................ 22

*Tactica Int'l, Inc. v. Atlantic Horizon Int's, Inc.*, 154 F. Supp. 2d 586 (S.D.N.Y. 2001)............ 19

*USAchem, Inc. v. Goldstein*, 512 F.2d 163 (2d Cir. 1975) ......................................................... 23

*Walker v. Sheldon*, 10 N.Y.2d 401, 223 N.Y.S.2d 488 (1961)................................................... 24

*WebMD Health Corp. v. Martin*, 2006 N.Y. Slip Op. 51325(U) (N.Y. Sup. Ct. July 11, 2006)........................................................................................................................ 11

*Western Elec. Co. v. Brenner*, 41 N.Y.2d 291, 392 N.Y.S.2d 409 (1977) ................................. 16

*White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 460 F.3d 281 (2d Cir. 2006).............. 11, 21

*Wright v. Goord*, 554 F.3d 255 (2d Cir. 2009) ......................................................................... 10

## Statutes

18 U.S.C. § 1030(a) ................................................................................................................... 17

N.Y. Gen. Bus. Law § 349............................................................................................................ 22, 23

## Rules

Fed. R. Civ. P. 56(a) ................................................................................................................... 10

Fed. R. Civ. P. 56(e) ................................................................................................................... 10

Judy Poller ("Poller") and her employer, American Outcomes Management, L.P. ("AOM"), seek summary judgment on all counts asserted against them by Poller's former employer, BioScrip, Inc. ("BioScrip" or the "Company").  Summary judgment is appropriate because the restrictive covenant agreement serving as the touchstone for BioScrip's claims – and which Poller seeks in her separate declaratory judgment complaint to have declared invalid – is an unlawful restraint designed to impede fair competition rather than protect BioScrip's legitimate interests.[1]  The undisputed issues of fact reveal the non-compete and non-solicitation provisions at issue here were not only imposed on Poller years after her employment with BioScrip began, but also that the provisions fail to protect the legitimate interests of BioScrip as required by law.  Indeed, as this Court already determined at the preliminary injunction stage, the information Poller allegedly took with her from BioScrip, and at the heart of BioScrip's claims, was not confidential or proprietary Company information.   Further, the circumstances surrounding the imposition of the restrictive covenant agreement – and the indisputably adverse changes to the terms and conditions of Poller's employment after its execution – render the agreement unenforceable as a matter of law.

## PRELIMINARY STATEMENT

AOM is a niche player in the home infusion therapy business, providing services to patients in a handful of states, including New York.  BioScrip is a publicly-traded company that provides specialty pharmaceutical products and services (including home infusion therapy services) throughout the country.

---

[1]  Poller is the plaintiff and counterclaim defendant in this matter.  BioScrip is a defendant in the action brought by Poller, and it has asserted counterclaims against Poller and third-party claims against her employer, AOM. Although AOM has been referred to occasionally in previous pleadings as a "counterclaim" defendant, it is more accurately referred to as a third-party defendant with respect to BioScrip's claims.  (*See* Dkt. No. 23; *see also infra* at p. 9.)

Poller is 63 years old and has over 24 years of cumulative experience in the pharmaceutical business, with the majority of that time spent selling home infusion products. By the time she began working as a home infusion sales representative at BioScrip on April 22, 2002, she had extensive experience and contacts with doctors and other professionals in the home infusion industry.

For the first seven years of her employment at BioScrip, Poller worked as an at-will employee without any post-employment restrictions. In January 2009, however, BioScrip presented Poller with a Restrictive Covenant Agreement ("RCA" or the "Agreement") as a condition of continued employment. Poller reluctantly executed the RCA in April 2009. During the same time period, BioScrip also implemented a new compensation plan for sales executives that significantly diminished Poller's total compensation from the Company in the following years.

Seeing her income drop by over $100,000 in 2009 and 2010, and concerned about other issues relating to BioScrip, Poller began looking for alternative employment in early 2011. She identified AOM as a potential employer and ultimately accepted a position with AOM in March 2011. Believing the RCA to be unenforceable in light of the circumstances of its execution and the changes to the terms and conditions of her employment, Poller promptly sought judicial relief from the Agreement. BioScrip responded by seeking a preliminary injunction, which this Court (Batts, J.) denied on March 23, 2011.

BioScrip asserts a wide variety of claims against Poller and AOM, but the claims falter out of the gate because the RCA is unenforceable for several reasons: first, the information BioScrip seeks to protect with the RCA is not confidential, as this Court found at the preliminary injunction hearing; second, the RCA does not legitimately protect any good will of BioScrip because of its overbreadth and Poller's well-established position in the industry before she came

to BioScrip; third, the circumstances surrounding the imposition of the RCA, as well as the changes in the terms and conditions of Poller's employment after its execution, render the Agreement invalid; and fourth, given that the services at issue involve pharmaceutical products for critically and acutely ill patients, public policy does not favor restricting Poller's ability to provide services to the doctors prescribing to these patients.

In the absence of an enforceable agreement, BioScrip's claims for breach of contract and related claims concerning her duties to her former employer should be dismissed.  BioScrip's tag-along common law and statutory claims are equally deficient for the reasons set forth in detail below and should also be dismissed.

## STATEMENT OF MATERIAL FACTS[2]

### I.     THE PARTIES AND RELEVANT SERVICES

#### A.     AOM and Poller

AOM is a privately-held company whose principal shareholder, Samuel Jampolis, M.D., is an oncology physician trained at Loyola Medical School, the University of Chicago, and MD Anderson Hospital in Houston, Texas.  (SMF ¶¶ 1-2 and 5.)  AOM provides home infusion services in several states, including New York, New Jersey, and Connecticut.  (*Id.*)  AOM's home infusion services focus on the care of patients with chronic and acute disease conditions.  (SMF ¶ 6.)

The principal home infusion service provided by AOM is intravenous immunoglobulin ("IVIG"), a highly-specialized therapy predominantly prescribed for patients with primary and autoimmune disorders, although it is also prescribed for other clinical conditions.  (SMF ¶¶ 7-8.) IVIG comprises approximately 84% of AOM's total business.  (*Id.*)

---

[2]  Poller and AOM rely upon and incorporate by reference herein the Statement of Material Facts ("SMF") filed in support of their Motion for Summary Judgment.

Poller is a sales representative at AOM.  (SMF ¶ 9.)  She is 63 years old and resides in New Jersey.  (*Id.*)  She has over 18 years of experience in the home infusion industry – particularly with respect to the sale of IVIG products and services – and she has over 24 years of experience in pharmaceutical sales.  (*Id.*)  Over the course of her long career, Poller developed close relationships with many referral sources (primarily doctors) in the IVIG therapy industry.  (*Id.*)

### B.    BioScrip

BioScrip is a publicly-traded company that provides comprehensive pharmaceutical care solutions, including specialty pharmaceutical programs.  (SMF  ¶¶ 10-11.)    BioScrip's Infusion/Home Health Services segment provides services consisting of home infusion therapy, respiratory therapy, and the provision of durable medical equipment products and services.  (*Id.*)  BioScrip's revenue in 2010 was approximately $1.6 billion and its revenue in 2011 was a little over $1.8 billion.  (SMF ¶¶ 12-13.)  BioScrip's Infusion/Home Health Services segment revenue for the year ended December 31, 2011, was $451 million, compared to revenue of $377.2 million for the same period in 2010 – an increase of $73.8 million, or 19.6%.  (*Id.*)[3]

### C.    The Relevant Products and Services

Both BioScrip and AOM provide home infusion services, including IVIG therapy, to patients with certain chronic and acute conditions.  (SMF ¶¶ 5-6 and 10-11.)  The primary referral sources for businesses selling home infusion products are the doctors who prescribe and monitor the treatment plans and protocols designed for their patients.  (SMF ¶ 23.)  The therapy is generally administered in the home by nurses; those nurses may be full-time or per diem employees of AOM or BioScrip or their competitors.  (SMF ¶ 29.)  The per diem nurses may work for more than one home infusion company.  (*Id.*)

---

[3]  Excluding first quarter incremental revenue associated with an acquisition, BioScrip's Infusion/Home Health Services segment revenue increased $10.5 million, or 2.8%, over the prior period, as a result of overall volume growth.  (*See* SMF ¶¶ 12-13.)

## II. POLLER'S WELL-ESTABLISHED EMPLOYMENT HISTORY IN THE HEALTHCARE INDUSTRY PRIOR TO BIOSCRIP

Poller began working in the healthcare industry in approximately 1986 when she worked at Abbott Laboratories ("Abbott") selling a diet program to hospitals.  (SMF ¶¶ 14-15.)  She left Abbott after a few years and began working in the late 1980s for a home infusion company called HNS, which was followed by employment at a company called Thermalese, where she sold hair removal products to physicians.  (*Id.*)

In 1996, Poller again began working as a sales representative in the home infusion business when she took a position as a sales associate at Pharmacare.  (SMF ¶¶ 16-17.) Pharmacare later became Accredo Health Care Group, Inc. ("Accredo").  (*Id.*)  Poller worked as a sales representative at Accredo from 1996 until April 2002.  (*Id.*)  She was subject to a non-compete agreement while at Accredo.  (*Id.*)

## III. POLLER'S EMPLOYMENT HISTORY AT BIOSCRIP

### A. For the Majority of Her Tenure at BioScrip, Poller Did Not Have a Restrictive Covenant Agreement

On or about April 22, 2002, Poller began employment with ADIMA Scrip Solutions as a Regional Sales Director.[4]  (SMF ¶ 18.)  She informed representatives of ADIMA that she would not sign a non-compete or non-solicitation agreement – noting that she had such an agreement with Accredo and did not want similar restrictions on her ability to earn a living in the future. (SMF ¶¶ 19-20.)  ADIMA agreed to forego a restrictive covenant agreement with Poller.  (*Id.*)

Poller brought over $3 million of business with her from Accredo and immediately began to work to expand that business.  (SMF ¶ 21.)  She ultimately developed a book of business for

---

[4]  The ADIMA acronym stands for American Disease Management Associates, LLC.  ADIMA was an integrated specialty pharmacy and home healthcare company, providing infusion and injection-based pharmaceutical products. (SMF ¶ 18.)  ADIMA was owned by MIM Corporation ("MIM").  (*Id.*)  MIM changed its name to BioScrip in March 2005 after a merger with Chronimed Inc., another company providing specialty pharmacy and therapy management products and services.  (*Id.*)

ADIMA/BioScrip (hereafter inclusively "BioScrip") with a value of over $12 million in annual revenues for her sales territory in the greater New York City metropolitan area and Long Island. (*Id.*)

Poller's ultimate title at BioScrip was Chronic Care Sales Representative; she called on doctors who had patients in need of home infusion services.  (SMF ¶ 23.)  The primary referral sources for businesses selling home infusion products are the doctors who prescribe and monitor the treatment plans and protocols designed for their patients.  (*Id.*)  Poller identified the doctors and nurses she could potentially call on through publicly available information such as medical directories in the New York City area, telephone books, and internet searches.  (SMF ¶ 25.) After securing a patient referral from a physician, Poller would supply the information to BioScrip relating to that patient over the telephone.  (SMF ¶ 24.)

In addition to full-time sales representatives such as Poller, BioScrip used independent contractors to sell its home infusion products and services.  (SMF ¶¶ 26-27.)  During the 2010-2011 time period, for example, BioScrip had seven full-time sales people selling home infusion services in addition to two independent contractors.  (*Id.*)  The independent contractors were free to work with other companies, and one of them, Kim Dontas ("Dontas"), is an employee of AOM who sells IVIG services.  (*Id.*)  Notwithstanding her status as an employee of AOM, Dontas has an independent contractor relationship with BioScrip and is authorized to sell BioScrip's services.  (*Id.*)   AOM also employs a sales representative named Janet Berkeley ("Berkeley") who has worked for AOM, then BioScrip, and then back to AOM. (SMF ¶ 28.) Berkeley did not have a restrictive covenant agreement at BioScrip. (*Id.*)

**B.**     **BioScrip's Requirement That Poller Sign a Non-Compete and Non-Solicitation Agreement as a Condition of Continued Employment**

In January 2009, notwithstanding the fact that Poller had been employed by BioScrip for nearly seven years as an at-will employee without any restrictions on her post-employment right to earn a living, BioScrip presented Poller with the RCA at issue here. (SMF ¶ 30.)  Poller was told – and the Agreement itself confirmed – that she would be required to execute the Agreement "as a condition of continued employment."  (*Id.*)  She reluctantly signed the RCA on or about April 8, 2009, to avoid termination.[5]  (*Id.*)

**C.**     **Changes in the Terms and Conditions of Poller's Employment**

BioScrip implemented a new compensation plan in 2009 for its infusion therapy sales force that ultimately resulted in the drastic reduction of Poller's compensation.  (SMF ¶ 31.)  Because the plan was applicable to all sales representatives in home infusion, Poller had no choice but to acknowledge and accept the plan.  (*Id.*)

A review of Poller's total compensation (salary and commissions) at BioScrip for the years 2007, 2008, 2009, and 2010 shows a significant reduction in compensation as a result of BioScrip's revised compensation plans.  Specifically (and in round numbers), in 2007, Poller earned $396,500, while she earned approximately $430,000 in 2008.  (SMF ¶ 32.)  In stark contrast to those earnings, in 2009, Poller's salary and commission earnings decreased to $285,000 and then decreased again in 2010 to $280,000.  (*Id.*)  The substantial decrease in Poller's commissions occurred despite the maintenance of her sales for BioScrip during this time period.  (SMF ¶ 21.)

---

[5]  Poller further contends that she executed the Agreement under duress, not only because she was told she had to sign the Agreement to remain employed (a fact BioScrip cannot dispute), but also because she was told BioScrip would not pay commissions she had already earned.  Although the latter point is in dispute – as would be the ultimate determination of whether Poller executed the RCA under duress – those facts that are *not* in dispute (as discussed in this memorandum) are more than sufficient to support a finding on summary judgment that the RCA is not enforceable.  (*See infra* at pp. 12-16.)

There were additional changes at BioScrip affecting her income and benefits.  For example, at the beginning of 2011, Poller learned that BioScrip would no longer contribute an employer match to her 401k Plan (previous matches had been in the $8,000 range) and her healthcare premiums would increase substantially.  (SMF ¶ 33.)

In addition to the direct financial issues outlined above, in January 2010, BioScrip updated its 2009 incentive plan to allow sales representatives who were not selling IVIG services to begin to offer such services to doctors in Poller's territory.  (SMF ¶¶ 35-36.)  As a result of the new policy, Poller received a complaint from one of her physician referral sources regarding the solicitation.[6]  (SMF ¶¶ 37-38.)

Finally, as a result of management changes, as well as a reduction of force in the Company's specialty pharmacy business, Poller noticed not only that many BioScrip employees were leaving the Company – some voluntarily and some not – but also that the turnover was adversely affecting her ability to service her referral sources.  (SMF ¶ 39.)

## IV.    POLLER'S DECISION TO LEAVE BIOSCRIP

Faced with the prospect of continuing employment for BioScrip with a reduced compensation package, internecine competition from non-IVIG sales representatives, and a questionable support group, Poller began to seek other employment in early 2011, eventually deciding to leave BioScrip.  (SMF ¶ 40.)  She pursued an opportunity at AOM and two other companies.  (*Id.*)  Given her age and the challenges and stresses of changing jobs, Poller was reluctant to leave BioScrip.  (SMF ¶¶ 41-42.)  Nevertheless, Poller felt she had no choice but to

---

[6]  Although BioScrip sought to prevent interference with existing relationships by requiring a manager's approval before a salesperson could obtain a commission on product sold to another salesperson's referral source (SMF ¶ 37), the fact remains that another sales executive could begin to establish a relationship in IVIG therapy with existing referral sources of Poller.  (SMF ¶¶ 37 and 39.)  Further, non-IVIG sales representatives could now compete with Poller in her territory to the extent the referral source did not have an existing relationship with her, thus having the effect of diminishing her prospects for new business.

leave and accepted a position at AOM, beginning work on Monday, March 7, 2011.  At AOM, Poller continues to seek business from doctors she has identified through publicly-available sources, including those she has known since her days at Accredo, prior to the time she went to work for BioScrip.  (SMF ¶ 44.)

## PROCEDURAL HISTORY

Recognizing that BioScrip would seek to enforce the RCA – an agreement she believed unenforceable – Poller sought a declaration in New York state court as to the Agreement's unenforceability.  (Dkt. No. 1-1.)  She served the complaint on March 7, 2011.  (*Id.*)  BioScrip removed the case to this Court and sought a preliminary injunction to prohibit Poller from working for AOM and to enforce the non-compete and non-solicitation covenants in the RCA.  (Dkt. No. 3.)  After two days of testimony in March 2011, Judge Batts denied BioScrip's request for a preliminary injunction, issuing a decision that found:  (1) the information BioScrip claimed to have been proprietary was not in fact confidential or proprietary to the Company; and (2) any harm with respect to the non-compete and non-solicitation agreement could be remedied by an award of damages *if* BioScrip could prevail at trial.  The Court also stated that BioScrip had not shown a likelihood of success on the merits.  (SMF ¶ 46.)

On April 22, 2011, notwithstanding the Court's finding that it had not established a likelihood of success on the merits, BioScrip filed an Answer, Counterclaim and Third-Party Complaint asserting counterclaims against Poller and separate claims against AOM.  (Dkt. No. 23.)  On May 5, 2011, BioScrip filed a document captioned "Amended Counterclaims" that lumps together as "counterclaims" the claims asserted against both Poller and AOM.  *See, supra,* p. 1 n.1.

## ARGUMENT

I.   **RELEVANT STANDARDS AND CHOICE OF LAW**

    A.   **The Summary Judgment Standard**

Summary judgment is appropriate when "there is no genuine issue as to any material fact" such that "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of genuine issues of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986), with the court viewing the "evidence in the light most favorable to the nonmoving party," *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has set forth facts that favor summary judgment, the opposing party must "set out specific facts showing a genuine issue for trial" and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The Second Circuit has made clear that "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" because "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted).  To defeat summary judgment, the non-moving party must offer some hard evidence showing that its version of the events is not wholly fanciful.  *See, e.g.*, *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 101 (2d Cir. 1997); *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

    B.   **Choice of Law**

Section 7 of the RCA states that Delaware law shall apply to the "interpretation, application and enforcement of the Agreement without regard or respect for any choice of law principles to the contrary of Delaware or of the state where [Poller] may reside at the time of

enforcement."  Federal courts sitting in diversity apply the law of the forum state to determine choice-of-law issues.  *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001).

New York applies different choice-of-law analyses depending on the nature of the claim.  *Fieger*, 251 F.3d at 394 (citing *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1539-41 (2d Cir. 1997)).  With respect to the contract-based claims at issue here, New York gives deference to the parties' designation of law in the contract.  *Id.* at 393.  When the claim sounds in tort, New York choice-of-law principles focus on which state has the greater interest in the litigation.  *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006).

New York and Delaware law are essentially indistinguishable with respect to the enforcement of agreements that restrict an employee's post-employment freedom.  *WebMD Health Corp. v. Martin*, 2006 N.Y. Slip Op. 51325(U), 7-8 (N.Y. Sup. Ct. July 11, 2006) (noting that "New York law is not significantly different" from New York law) (citing *Research & Trading Corp. v. Pfuhl*, No. 12527, 1992 Del. Ch. LEXIS 234, *16-17 (Del. Ch. Ct. Nov. 18, 1992)).[7]  In the absence, as is the case here, of an actual conflict between the law of the jurisdictions at issue, a court need not choose which of the legal principals to apply.  *Innoviant Pharm., Inc. v. Morganstern*, 390 F. Supp. 2d 179, 187 (N.D.N.Y. 2005); *Matter of Allstate Ins. Co.*, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905 (1993).  Nevertheless, in the interest of

---

[7]  Delaware law would not apply to the determination of whether the RCA was signed under duress, and Poller hereby expressly preserves that argument for trial in the event summary judgment is denied.  Because duress presupposes that an agreement has not been entered into validly, a choice of law provision in any such agreement would have no force and effect.  *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000) (choice of law provision not binding if procured through duress).

completeness, AOM and Poller will cite to both Delaware and New York law to show that the RCA is unenforceable under either state's law.[8]

## II. THE RCA IS UNENFORCEABLE BECAUSE IT DOES NOT REASONABLY PROTECT BIOSCRIP'S LEGITIMATE INTERESTS WHEN APPLIED TO POLLER

Both New York and Delaware law disfavor restrictive covenants in employment agreements. *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388, 690 N.Y.S.2d 854, 856 (1999); *Gilman & Ciocia, Inc. v. Randello*, 55 A.D.3d 871, 866 N.Y.S.2d 334 (2d Dep't 2008); *Sapp v. Casey Employment Servs.*, No. 10781, 1989 Del. Ch. LEXIS 150 (Del. Ch. Ct. Nov. 3, 1989). In addition, courts in New York and Delaware will only enforce agreements restricting competition if, among other factors, the purpose of the agreement is to protect the legitimate interests of the employer and the agreement's operation, in fact, reasonably protects those interests. *Elite Cleaning Co., Inc. v. Capel*, No. 690-N, 2006 Del. Ch. LEXIS 105, *28 (Del. Ch. Ct. June 2, 2006) (Delaware courts will not enforce a restrictive covenant "that is more restrictive than an employer's legitimate interests justify or that is oppressive to an employee.") (quoting *RHIS, Inc. v. Boyce*, No. 18924, 2001 Del. Ch. LEXIS 118, at *6-7 (Del. Ch. Ct. Sept. 26, 2001)); *Research & Trading Corp.*, 1992 Del. Ch. LEXIS 234, *16-17; *see also BDO Seidman*, 93 N.Y.2d at 388-89, 690 N.Y.S.2d at 857 (New York will decline to enforce a restrictive covenant agreement unless: (1) the restrictive covenant is no greater than is required for the protection of the legitimate interest of the employer; (2) the restrictive covenant does not impose undue hardship on the employee; and (3) the restraint on competition is not injurious to the public). An employer's legitimate interests include "protection of employer goodwill [of its clients] and

---

[8]  As the forum state and the state in which Poller both worked for BioScrip and now works for AOM, New York unquestionably has a greater interest than Delaware in the outcome of the non-contract-based claims. Delaware's sole contact with the parties is through BioScrip's incorporation there. Because of New York's greater interest, the claims sounding in tort will be analyzed in the context of New York law.

protection of employer confidential information from misuse." *Research & Trading Corp.*, 1992 Del. Ch. LEXIS 234, at *32.

The RCA at issue here is unenforceable against Poller for several reasons, all of which, taken individually or together, reveal that the RCA does not protect a legitimate interest of BioScrip, but instead serves as an unlawful restraint on competition, and that the Agreement is oppressive in that it imposes an undue hardship on Poller. *See, e.g.*, *BDO Seidman*, 93 N.Y.2d at 389, 690 N.Y.S.2d at 857 (restrictive covenants construed strictly "to limit enforcement of broad restraints on competition").

<u>First</u>, although the protection of confidential information may serve as a legitimate interest worthy of protection under a restrictive covenant agreement, BioScrip, as this Court has already found, did not provide confidential information to Poller. To begin, information relating to the doctors who are referral sources for BioScrip's home infusion business is publicly available in telephone directories and through internet searches. (SMF ¶ 25.) Further, given her experience in the industry before her BioScrip employment, many of Poller's referral sources were within her personal knowledge – in other words, she did not learn of them through BioScrip. In addition, to the extent BioScrip relies on patient information, that information was gathered initially by Poller from the relevant doctors' offices and could not possibly be considered proprietary or confidential to BioScrip, as this Court has already found. (SMF ¶¶ 24 and 46.) In particular, while certain of the information is certainly confidential to the patient, it is not BioScrip's proprietary information, nor is it used exclusively by BioScrip given that it comes from the doctor's office and, ultimately, the patient. Moreover, although BioScrip refers generally to other information it considers confidential, simply declaring information as proprietary and confidential is not enough – it must show the information was in fact

confidential, and it cannot do so here.  Finally, BioScrip cannot show that Poller or AOM has used any of the information it claims to be confidential.

Second, the RCA does not legitimately protect the good will of the Company with respect to customer relationships because it is overbroad.  In particular, the Agreement seeks to preclude Poller, for one year, from working for any competitor within her former BioScrip territory (SMF ¶ 30 (Whiteley Dec. Ex. B-2)), which would have the effect of completely eliminating her ability to sell home infusion products in the greater New York region, irrespective of the fact that she had been engaged in that business long before coming to BioScrip and in contravention of well-established law precluding enforcement of a covenant restricting an employee from soliciting customers with whom he or she had no contact while at the employer.  *See, e.g.*, *BDO Seidman*, 93 N.Y.2d at 392, 690 N.Y.S.2d at 859 (extending anti-competitive covenant to customers with whom employee did not have a relationship would be an unreasonable restrain on trade); *Scott, Stackrow & Co., CPA's, PC v. Skavina*, 9 A.D.3d 805, 806, 780 N.Y.S.2d 675, 677 (3d Dep't 2004).  The RCA is also overbroad because it seeks to preclude solicitation for a two-year period, which is far too lengthy given the facts and circumstances here.  *See, e.g.*, *Elite Cleaning Co., Inc.*, 2006 Del. Ch. LEXIS 105, at *30; *RHIS, Inc.*, 2001 Del. Ch. LEXIS 118, at *22-23.[9]

Third, the circumstances surrounding the execution of the RCA leave little doubt that the Agreement was imposed on Poller in an effort to restrict her freedom to change employers and her ability to compete fairly with BioScrip in the event she chose to leave the Company in response to pending reductions in her compensation.  The same circumstances also reveal the

---

[9] Although the number of referral sources with whom Poller had pre-existing relationships prior to joining BioScrip – and the lack of support from BioScrip in Poller's development of all of her referral sources – present contested issues of fact, the fact that Poller came to BioScrip as a seasoned pharmaceutical sales executive cannot be contested and is of relevance to the ultimate determination of whether the RCA protects BioScrip's good will.  *Cf. FTI Consulting, Inc. v. Graves*, No. 05 Civ. 6719 (NRB), 2007 U.S. Dist. LEXIS 55325, *26-27 (S.D.N.Y. July 30, 2007) (employer had no cognizable interest in the relationships between former employee and clients acquired prior to the employee's employment with employer).

- 14 -

oppressive nature of the Agreement.  It is undisputed that BioScrip employed Poller from April 2002 to April 2009 without a restrictive covenant in place.  Nothing about the nature of the business had changed in 2009 that would suggest BioScrip suddenly had a legitimate business interest requiring the imposition of a restrictive covenant agreement that, until then, BioScrip had not required.  Nevertheless, as a condition of continued employment, BioScrip mandated that Poller execute the RCA.  She was 59 years old at the time and had been with the Company for seven years.  Moreover, while BioScrip sought to dress the RCA up (for consideration purposes) with claims that it was offering continued employment and an additional week of severance in the event of termination, that sales pitch was belied by the fact that BioScrip was simultaneously imposing a new compensation plan that drastically reduced Poller's earnings.

Fourth, the changes in the terms and conditions of Poller's employment after her execution of the RCA further militate against enforcement.  Those changes include a drastic reduction in her compensation in the years 2010 and 2011, bringing her from earning salary and commissions averaging $413,000 in 2007 and 2008 to an average of $282,000 in 2009 and 2010 – a difference of over $130,000 or 32%.  That change alone renders the RCA unenforceable.  But there were other changes as well, including the introduction of a cross-selling initiative that Poller believed jeopardized her referral source relationships and curtailed avenues for new business development (SMF ¶ 36); the discountenance of a 401k employer match – an issue of particular importance to an employee approaching retirement (SMF ¶ 33); and an increase in her healthcare premiums (*Id.*)

Fifth, the Agreement unquestionably imposes an undue hardship on Poller.  She is 63 years old and has spent the majority of her professional life as an IVIG salesperson in the metropolitan New York area.  While BioScrip has suggested she could work in other sales roles,

this Court (Batts, J.) recognized the common sense flaws in that argument at the injunction hearing.  (Whiteley Dec., Ex. A, PIH Hearing Tr. 99:8-100:17.)

Finally, the restraint is injurious to the public given the nature of the business at issue here – the provision of home infusion therapy to patients with chronic illnesses.  Enforcing the restrictive covenants would unnecessarily curtail the options presented to doctors and patients with respect to their choice of home infusion therapy providers.

## III.   THE COMMON LAW BREACH OF FIDUCIARY DUTY AND LOYALTY CLAIMS MUST BE DISMISSED BECAUSE THERE IS NO EVIDENCE OF BREACH

Counts Three and Four respectively assert claims for breach of fiduciary duties and the duty of loyalty.  (Dkt. No. 26, pp. 18-20.)  The claims are closely related and will be discussed together.  An employee owes a duty of good faith and loyalty to her employer under both Delaware and New York law.  *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010); *Western Elec. Co. v. Brenner*, 41 N.Y.2d 291, 295, 392 N.Y.S.2d 409, 411 (1977).  BioScrip alleges that Poller violated those duties by misappropriating confidential information, destroying electronic files, and competing with BioScrip in breach of the RCA.  (Dkt. No. 26, Amended Counterclaims ¶¶ 94 and 101.)  Those allegations, however, involve actions allegedly taken by Poller *after* she had resigned from BioScrip and, therefore, cannot form the basis of a common law claim for breach of fiduciary duty.  *See, e.g.*, *Brenner,* 41 N.Y.2d at 295, 392 N.Y.S.2d at 411 (employer-employee relationship is one of contract, express or implied, and employee is bound to exercise good faith and loyalty *in the performance of her duties*).  Once those employment duties have ceased, so too have any common law duties of loyalty.

## IV.   THE COMPUTER FRAUD AND ABUSE ACT CLAIM FAILS BECAUSE POLLER'S ACCESS WAS AUTHORIZED AND WITHOUT AN INTENT TO DEFRAUD[10]

The Computer Fraud and Abuse Act ("CFAA") penalizes the knowing and unauthorized access to a "protected computer" with intent to defraud or cause damage, resulting in a furtherance of the fraud and capturing of anything of value.  18 U.S.C. § 1030(a); *P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC*, 428 F.3d 504 (3d Cir. 2005).

The Ninth Circuit and two district courts within the Second Circuit have held that an employee with authority to access her employer's computer system does not violate the CFAA by using her access privileges even if she has done so to misappropriate information.  *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1130-31 (9th Cir. 2009) ("No language in the CFAA supports [the] argument that authorization to use a computer ceases when an employee resolves to use the computer contrary to the employer's interest."); *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 692 F. Supp. 2d 373, 385 (S.D.N.Y. 2010) ("[R]eading the phrases 'access without authorization' and 'exceeds authorized access' to encompass an employee's misuse or misappropriation of information to which the employee freely was given access and which the employee lawfully obtained would depart from the plain meaning of the statute."); *Jet One Group, Inc. v. Halcyon Jet Holdings, Inc.*, No. 08 Civ. 3980 (JS), 2009 U.S. Dist. LEXIS 72579, *16-17 (E.D.N.Y. Aug. 14, 2009).[11]

---

[10]  Because the remainder of BioScrip's claims do not rest on principles of contract or employment law, or are based on specific New York statutes, each of these claims will be analyzed solely under New York law or the relevant statute.

[11]  These cases rest on three primary rationales.  First, the plain language of the CFAA, which prohibits improper "access" but says nothing about misuse or misappropriation.  *LVRC Holdings LLC*, 581 F.3d at 1135; *Jet One Group, Inc.*, 2009 U.S. Dist. LEXIS 72579, at *18.  Second, because the CFAA is principally a criminal statute, the rule of lenity requires courts to interpret it narrowly and resolve any ambiguity in a defendant's favor.  *Jet One Group, Inc.*, 2009 U.S. Dist. LEXIS 72579, at *18; *Orbit One*, 692 F. Supp. 2d at 386.  And third, the statute's language and legislative history show that Congress intended it to proscribe hacking – not misappropriation of lawfully accessed information.  *Jet One Group, Inc.*, 2009 U.S. Dist. LEXIS 72579, at *19.

Here, Poller cannot be held liable for a violation of the CFAA because she was authorized to use her BioScrip laptop.  Even if BioScrip could prevail at trial on the issue of whether Poller downloaded confidential information for the purpose of competing with BioScrip (which it cannot), that fact alone is insufficient to prove a claim.  With respect to the additional elements of the claim, BioScrip cannot show that any access by Poller to her laptop was with an intent to defraud or cause damage.

## V.   BIOSCRIP DOES NOT HAVE SUFFICIENT EVIDENCE TO PURSUE ITS UNFAIR COMPETITION CLAIMS

Under New York law, the essence of an unfair competition claim is that "the defendant has misappropriated the labors and expenditures of another" and has done so in bad faith. *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980); *see also CA, Inc. v. Simple.com, Inc.*, 621 F. Supp. 2d 45, 52 (E.D.N.Y. 2009) (explaining that, although the tort of unfair competition is a broad doctrine, a claimant must show more than commercial unfairness).

The scope of an unfair competition action is generally limited to three categories: "'passing off one's goods as those of another, engaging in activities solely to destroy a rival[,] and using methods themselves independently illegal.'"  *Paper Corp. of U.S. v. Schoeller Technical Papers, Inc.*, 759 F. Supp. 1039, 1046 (S.D.N.Y. 1991) (quoting *Ray v. Proxmire*, 581 F.2d 998, 1002, 189 U.S. App. D.C. 220 (D.C. Cir. 1978)); *see also Kwan v. Schlein*, 441 F. Supp. 2d 491, 502 (S.D.N.Y. 2006).

BioScrip's claims obviously are not based on a theory that Poller or AOM sought to "pass off" AOM's home infusion services as BioScrip's or that they sought to "destroy" AOM. As a result, the unfair competition claim can only be sustained if BioScrip can present admissible evidence of bad faith.  It cannot do so.  In the first instance, with respect to the RCA, it cannot dispute a wide variety of factual issues that implicate the enforceability of the Agreement, nor

can it dispute the fact that Poller promptly sought judicial relief from the Agreement.  Moreover, BioScrip cannot show that Poller or AOM used any of the information BioScrip alleges was taken.  In the absence of such proof, the unfair competition claim fails.

## VI.   BIOSCRIP'S MISAPPROPRIATION OF TRADE SECRETS CLAIM FAILS BECAUSE THIS COURT HAS ALREADY FOUND THE INFORMATION AT ISSUE WAS NOT CONFIDENTIAL – LET ALONE A TRADE SECRET

To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate:  (i) that it possessed a trade secret; and (ii) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means.  *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999).  BioScrip's claim fails for two fundamental reasons.

First, it cannot show that any of the routine information in Poller's possession rises to the level of a trade secret.  *Gemmy Indus. Corp. v. Chrisha Creations Ltd.*, No. 04 Civ. 1074, 2004 U.S. Dist. LEXIS 11468, at *31 (S.D.N.Y. June 23, 2004) (price lists, product samples, and "marketing plans" are not, as a matter of law, protected as trade secrets); *Tactica Int'l, Inc. v. Atlantic Horizon Int's, Inc.*, 154 F. Supp. 2d 586, 607 (S.D.N.Y. 2001) (information the plaintiff sought to claim as trade secret – information concerning the references of its customers – could easily be recalled by the defendants or obtained by contacting the customers directly and was not a trade secret).  Notably, even an employee's "knowledge of the intricacies of [his former employer's] business operation" – an allegation BioScrip could not make here – would not rise to the level of trade secret status.  *Reed, Roberts Assocs., Inc. v. Strauman,* 40 N.Y.2d 303, 309, 386 N.Y.S.2d 677, 680 (1976).  As set forth above (*see* pp. 13-14), the information BioScrip seeks to protect is neither confidential nor proprietary to the Company and, therefore, cannot conceivably rise to the level of trade secret status.

Second, even if the information was a trade secret, BioScrip does not have any evidence that such information was disclosed by Poller to AOM or used by Poller or AOM.  *See Metito (Overseas) Ltd. v. GE*, No. 05 Civ. 9478, 2009 U.S. Dist. LEXIS 12590 (S.D.N.Y. Feb. 18, 2009) (trade secret claim dismissed because no evidence of disclosure).

## VII.   AN UNJUST ENRICHMENT CLAIM MUST BE DISMISSED WHEN A CONTRACT GOVERNS THE RELATIONSHIP BETWEEN THE PARTIES

To prevail on a claim for unjust enrichment in New York, a plaintiff must establish: (i) that the defendant benefitted; (ii) at the plaintiff's expense; and (iii) that equity and good conscience require restitution.  *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir. 2000) (citation omitted).  Because it is a quasi-contract claim, the existence of a valid written contract precludes proceeding on grounds of unjust enrichment *Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656 (1987).  Because BioScrip's central claim against Poller is that she breached the restrictive covenants in the RCA, that Agreement controls and BioScrip cannot pursue a claim for unjust enrichment against Poller.[12]

With respect to AOM, there is no basis for an unjust enrichment claim because the relationship between AOM and BioScrip is far too attenuated to support such a claim.  *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 919 N.Y.S.2d 465 (2011); *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 831 N.Y.S.2d 760 (2007).  Further, even when a plaintiff alleges that a new employer has usurped opportunities from a new employee's former employer, an unjust enrichment claim will still fail.  *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 448 (S.D.N.Y. 2011) (unjust enrichment claim unavailable when an employer allegedly benefits from

---

[12]  The fact that the Agreement is unenforceable cannot be used to resurrect BioScrip's doomed unjust enrichment claim because the Company, even in the absence of an agreement, cannot establish that "equity and good conscience" require restitution from Poller given the circumstances surrounding BioScrip's imposition of the RCA and BioScrip's reduction in Poller's commissions and benefits.  *See supra*, pp. 7-8.

misappropriated information gleaned from former employee of competitor, even if the defendant's employer knows of or induces such misappropriation). Finally, because Poller is free to compete given the unenforceability of her Agreement, and because BioScrip cannot show AOM has misappropriated any confidential information or trade secrets, its unjust enrichment claim against AOM must fail.

## VIII.  BIOSCRIP'S INTERFERENCE CLAIMS FALTER BECAUSE REFERRAL SOURCES AND PATIENTS ARE NOT BOUND TO USE BIOSCRIP AND BIOSCRIP CANNOT SHOW MALICIOUS CONDUCT

In order to prevail on a cause of action for tortious interference with contractual relations, a plaintiff must establish:  (i) the existence of a valid contract between the plaintiff and a third party; (ii) the defendant's knowledge of that contract; (iii) that the defendant intentionally procured a breach of that contract; and (iv) resulting damages to the plaintiff.  *White Plains Coat & Apron Co., Inc.*, 460 F.3d at 285; *Metito (Overseas) Ltd.*, 2009 U.S. Dist. LEXIS 12590 (absolutely no evidence that could support a finding that GE tortiously interfered with Metito's contract with Sonmale, and GE is entitled to summary judgment on this claim).

To establish tortious interference with economic relations, a plaintiff must prove:  (i) the plaintiff had business relations with a third party; (ii) the defendant interfered with those business relations; (iii) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendant's acts injured the relationship.  *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008); *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006).  The plaintiff must be able to "demonstrate both wrongful means and that the wrongful acts were the proximate cause of the rejection of the plaintiff's proposed contractual relations."  *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 172 (2d Cir. 2004) (quoting *Pacheco v. United Med. Assoc., P.C.*, 305 A.D.2d 711, 712, 759 N.Y.S.2d

556, 559 (3d Dep't 2003)).  The motive for the interference must be "*solely malicious*, and the plaintiff has the burden of proving this fact."  *Pacheco*, 305 A.D.2d at 712, 759 N.Y.S.2d at 559 (quoting *John R. Loftus, Inc. v. White*, 150 A.D.2d 857, 860, 540 N.Y.S.2d 610, 612 (3d Dep't 1989) (emphasis added).

BioScrip's interference claims are premised on its allegation that Poller and AOM "intentionally, maliciously and without justification interfered in and induced the breach of BioScrip's current and prospective contractual and/or business relationships with patients and referral sources of BioScrip."  (Dkt. No. 26, Amended Counterclaims ¶ 125.)  BioScrip, however, cannot show it has express contractual agreements with physicians requiring referral to BioScrip and, in fact, referrals are often dependant on the patient's insurance, such that a doctor may refer one patient to BioScrip and another to AOM.  This fact dooms BioScrip's interference with a contractual relations claim.  (SMF ¶ 27.)  The Company fares no better with its fall-back claim of interference with economic relations because a simple referral relationship alone is insufficient as a matter of law to support an interference claim.  The doctors who are referral sources here are free to pick and choose among several home infusion providers, including BioScrip and AOM.  The claim also fails because BioScrip cannot prove that Poller's or AOM's actions were "solely malicious."

## IX.   NEW YORK'S CONSUMER PROTECTION LAW DOES NOT APPLY TO A PRIVATE DISPUTE SUCH AS THIS ONE

A claim under New York General Business Law § 349 (deceptive acts and practices) requires the plaintiff to establish:  (i) that the challenged act was consumer-oriented; (ii) that the challenged act was misleading in a material way; and (iii) that the plaintiff suffered injury as a result of the deceptive act.  *See Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 895 (2000).

- 22 -

Because Section 349 is fundamentally a consumer protection statute, private contractual disputes such as that at issue here are not cognizable under the statute. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 (1995). Further, BioScrip cannot show that AOM or Poller have acted deceptively in the conduct of their trade and in furnishing services within the State of New York, as it must to state a claim. To the contrary, Poller sought a judicial declaration of invalidity with respect to the RCA, and BioScrip can offer no evidence of deceptive conduct with respect to the services she and AOM provide to patients in New York.

## X.   BIOSCRIP'S REQUEST FOR PERMANENT INJUNCTIVE RELIEF SHOULD BE DISMISSED FOR THE SAME REASONS THIS COURT REJECTED THE REQUEST FOR PRELIMINARY RELIEF

A permanent injunction is a drastic remedy that will be issued only where a plaintiff demonstrates it will suffer irreparable harm in the absence of injunctive relief. *Icy Splash Food & Beverage v. Henckel*, 14 A.D.3d 595, 789 N.Y.S.2d 505 (2d Dep't 2005). To merit a permanent injunction, a plaintiff must demonstrate: (i) actual success on the merits; (ii) irreparable harm; and (iii) that the balance of the equities weighs in favor of issuing the injunction. *Maier-Schule GMC v. General Motors Corp.*, 850 F. Supp. 1095, 1101 (W.D.N.Y. 1994) ("Generally, to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted.") (internal citations omitted.)

Because the RCA is unenforceable, BioScrip cannot succeed on the merits. Further, even if it could potentially succeed, the time for injunctive relief has long passed. Indeed, when, as here, there has been a significant passage of time since the alleged breach and the court's consideration of the permanent injunction, the court will deny injunctive relief. *USAchem, Inc. v. Goldstein*, 512 F.2d 163, 169 (2d Cir. 1975) ("As we have indicated, such an injunction could only be granted with respect to [defendant's] solicitation of former customers of [plaintiff]. That

- 23 -

solicitation commenced more than two years ago; whatever special influence Goldstein was able to bring to bear on former clients has long since been exercised . . . . ").

## XI.     PUNITIVE DAMAGES ARE NOT WARRANTED

To obtain punitive damages in ordinary tort actions, a New York plaintiff must show that the defendant committed a tort under "circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton." *Prozeralik v. Capital Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479, 605 N.Y.S.2d 218, 225 (1993) (quoting Prosser and Keaton, *Torts* § 2, at pp. 9-10 (5th ed. 1984)).   This conduct must be "aimed at the public generally."  *Rocanova v. Equitable Life Assurance Soc. of U.S.*, 83 N.Y.2d 603, 612 N.Y.S.2d 339 (1994); *see also Walker v. Sheldon*, 10 N.Y.2d 401, 223 N.Y.S.2d 488 (1961); *Fabiano v. Philip Morris Inc.*, 54 A.D.3d 146, 149, 862 N.Y.S.2d 487, 490 (1st Dep't 2008) ("[P]unitive damages claims are quintessentially and exclusively public in their ultimate orientation and purpose . . . . A claim for punitive damages may . . . be rooted in personal injury, but for such a claim to succeed the injury must be shown . . . to reflect pervasive and grave misconduct affecting the public generally.").   The purpose of punitive damages is "not to compensate the injured party but rather to punish the tortfeasor and to deter th[e] wrongdoer and others similarly situated from indulging in the same conduct in the future."  *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 489, 836 N.Y.S.2d 509, 516 (2007).

For all of the reasons discussed throughout this memorandum, there is absolutely no basis to allow BioScrip to continue to pursue a claim for punitive damages.

**CONCLUSION**

For the reasons set forth in this Memorandum of Law, and based on the record provided in support of this Memorandum, Plaintiff and Counterclaim Defendant Judy Poller and Third-Party Defendant American Outcomes Management, L.P. respectfully request that the Court grant their Motion for Summary Judgment and dismiss all claims pursued against them by Defendant and Counterclaim/Third-Party Plaintiff BioScrip, Inc.

Respectfully submitted,

JUDY POLLER and
AMERICAN OUTCOMES MANAGEMENT, L.P.

By their attorneys,

/s/ Brian E. Whiteley
Brian E. Whiteley, *Admitted Pro Hac Vice*
Carolyn A. Marcotte, *Admitted Pro Hac Vice*
Hiscock & Barclay, LLP
One International Place, 26th Floor
Boston, Massachusetts 02110
Telephone:     (617) 274-2900
Facsimile:     (617) 722-6003
E-mail:   bwhiteley@hblaw.com
               cmarcotte@hblaw.com

Dated:  January 11, 2013

## <u>CERTIFICATE OF SERVICE</u>

      I, Brian E. Whiteley, counsel for Judy Poller and American Outcomes Management, L.P. in the above-captioned matter, hereby certify that, on this 11th day of January 2013, I caused the foregoing document to be electronically filed with the Clerk of the District Court for the Southern District of New York using the CM/ECF system, which sent notification of such filing to all registered participants identified on the Notice of Electronic Filing.


                              */s/ Brian E. Whiteley*
                                Brian E. Whiteley