UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
JUDY POLLER,                                                :
                                    Plaintiff,              :
                                                            :         11 Civ. 1675 (JPO)
                    -v-                                     :
                                                            :         OPINION AND ORDER
BIOSCRIP, INC.,                                             :
                                    Defendant.              :
                                                            :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

Plaintiff Judy Poller brought this declaratory judgment action against her former

employer, BioScrip, Inc. ("BioScrip"), seeking a judgment declaring invalid and unenforceable a

certain portion of the Restrictive Covenant Agreement ("RCA") between the parties.  BioScrip

counterclaimed, asserting eleven claims against Poller and her new employer, third-party

defendant American Outcomes Management, Inc. ("AOM").  AOM also asserts a counterclaim

against BioScrip.  Before the Court are Poller's motion for summary judgment on her declaratory

judgment claim, Poller and AOM's motion for summary judgment on BioScrip's counterclaims,

and BioScrip's motion for summary judgment on Poller's claim, three of its own counterclaims,

and AOM's counterclaim.  For the reasons that follow, the motions are granted in part and

denied in part.

1

## I.     Background[1]

### A.     Factual Background

BioScrip is a company that provides pharmaceutical products and services across the United States.  One such service is so-called "chronic care," whereby patients receive various long-term treatments, often administered in their homes.  BioScrip's chronic care business centers on intravenous immunoglobulin therapy ("IVIG").   IVIG is a blood product, containing immunoglobulin antibody, which is administered intravenously or subcutaneously, and is generally used in the treatment of patients suffering from neurological or immune deficiencies, or those receiving organ transplants.  Poller was a salesperson for the chronic care aspect of BioScrip's business, and the bulk of her work involved IVIG.

AOM, a private company run by oncology physician Samuel Jampolis, also provides home infusion services, meaning the intravenous injection of medications, and primarily serves patients in New York, New Jersey, and Connecticut.  AOM's home infusion services also focus on chronic care, and the principal home infusion service provided by AOM is IVIG, comprising 84% of AOM's business.  Both AOM and BioScrip rely on salespersons, like Poller, to develop referral sources—primarily doctors—who, in turn, refer patients for chronic care.

Poller, currently a salesperson at AOM, has worked in the home infusion industry for over 18 years, and has been involved in pharmaceutical sales for over 24 years.  Throughout her career, Poller has developed relationships with referral sources, primarily doctors, in the IVIG therapy industry.  And while Poller asserts that she formed many of these relationships prior to

---

[1] The following facts are taken from the parties' Local Rule 56.1 Statements (Dkt. Nos. 68, 76, 78, 81) and other submissions in connection with the instant motions.  They are undisputed unless otherwise noted.

joining BioScrip, BioScrip contends that no fewer than 85% of Poller's referral sources represent relationships that she developed after joining BioScrip.

In April 2002, Poller began work with ADIMA Scrip Solutions, whose then-parent—MIM Corporation—changed its name to BioScrip in 2005.  Prior to her resignation in March 2011, Poller had worked for BioScrip as a salesperson for nine years, as an at-will employee.  As a salesperson, she received commissions based on patient numbers and therapy sessions.  BioScrip's Strategic Business Units President, Michael Saracco, notes that "[a]s a long-term Sales Representative[,] Poller represented over $12 million in revenue to BioScrip in the geographic region of New York and Long Island."  Saracco also contends that this revenue was generated by service to fewer than 200 patients.  Accordingly, given the small number of patients and limited number of prescribing physicians, all parties agree that successful chronic care representatives, such as Poller, tend to be familiar with the treating doctors and nurses.

As a chronic care sales representative for BioScrip, Poller reached out to physicians who had patients requiring home infusion services and then would relay to BioScrip information obtained from doctors regarding to patients for whom IVIG would be provided in the home.  While Poller claims that she identified all of her referral sources through publicly available information, such as medical directories in the New York City area, phone books, and internet searches, BioScrip contends that referral source information is identified through a variety of channels, some public and others not.

In January 2009, BioScrip provided Poller with the RCA, which conditioned future employment with BioScrip on acceptance of its terms.  (Ex. B-2[2] "Your acceptance of the terms

---

[2] Poller and AOM's exhibits are attached to the Declarations of Brian E. Whiteley (Dkt. Nos. 69 and 82), and are cited as follows: "Ex. _" with the corresponding letter of the alphabet.

of this RC Agreement is a condition of your initial or continued employment with the Company.").)  Whereas Poller states that she was threatened with termination by BioScrip and pressured into signing the agreement, BioScrip claims that no one threatened Poller, that she possessed the agreement for several months before signing it, and that she reviewed its contents with her attorney.  In any event, Poller did sign the RCA on April 8, 2009.

The RCA included, *inter alia*, a Covenant Against Competition, which provided, in pertinent part: (1) a restriction on competition prohibiting Poller from participating in any "competing activities" in her territory for a period of one year with "competing activities" defined as "any activities that are the same as or similar in function or purpose to those you performed or supervised performance of on behalf of [BioScrip] in the two year period preceding your termination if such activities are being undertaken for the benefit of a business . . . that provides a product or service that would disclose one or more of [BioScrip's] business opportunities . . . ."; and (2) a restriction on customer and employee solicitation, barring Poller from soliciting BioScrip customers, clients, or referral sources, during a period of two years following termination, "for the purpose of inducing or helping the Covered Customer to cease or reducing doing business for [BioScrip] or for the purpose of diverting business opportunities away from [BioScrip]."  (Ex. 3 at ¶ 3.)  The RCA also included a provision relating to confidential information, prohibiting Poller from using for her own "benefit or for the benefit of others . . . all confidential and proprietary matters relating to [BioScrip] and the Business learned by [Poller]" during her employment.  (*Id.* at ¶ 4.)  The RCA defined confidential information as, *inter alia*:

---

BioScrip's exhibits are attached to the Declarations of Michael Weber (Dkt. Nos. 77 and 87), and are cited as follows: "Ex._" with the corresponding number.

> Information or compilations of information with respect to (i) the strategic plans, budgets, forecasts, intended expansions of product, service or geographic markets of the Company, (ii) sales figures, contracts, agreements, and undertakings with or with respect to customers, (iii) profit or loss figures, and (iv) customers, clients, suppliers, sources of supply and customer lists, and shall not disclose such Confidential Information to anyone outside of the company except with the Company's express written consent and except for Confidential Information which is at the time of receipt or thereafter becomes publicly known through no wrongful act of you or is received from a third party no under an obligation to keep such information confidential and without breach of this RC Agreement.

(*Id.*)

In February 2011, Poller met with AOM director, Dr. Jampolis, to discuss joining AOM. At that meeting, Poller told Dr. Jampolis that she planned to leave BioScrip, and engaged in a negotiation concerning her level of compensation.  All parties agree that Dr. Jampolis told Poller that he thought AOM could address Plaintiff's compensation needs.   On Thursday, March 4, 2011, AOM's attorneys, on Poller's behalf, filed—but did not serve on BioScrip—her declaratory judgment action against BioScrip in New York state court.  (Ex. 1.)  Also on March 4, Poller signed an employment agreement with AOM, although the "effective" date of the agreement was listed as March 7, 2011.  (Ex. E-3.)  This agreement includes an indemnification provision, by which AOM agrees to indemnify and hold harmless Poller for all liabilities arising from her "immediately preceding employer, BioScrip, Inc."  (*Id.* at ¶ 9.)  These obligations are wholly associated with Poller's "non-competition agreement and/or claims relating to the solicitation of clients, employees or business from Employee's immediately preceding employer."  (*Id.*)  Additionally, the AOM-Poller employment agreement includes a provision entitling Poller to her base salary of $160,000, even in the event of an injunction barring Poller from working for AOM.  (*See id.*; *id.* at ¶ 3.)

Poller prepared and signed a resignation letter to BioScrip on March 4, 2011, and she sent the letter to BioScrip by Federal Express on March 5, for delivery on Monday, March 7. Poller told one individual at BioScrip—the employee who handled her intake—about her departure on Sunday, March 6, 2011, but other than that, no one at BioScrip was aware of her departure until receiving her resignation letter on Monday, March 7.

It is undisputed that, over the course of the weekend of March 4-6, 2011, and during the week prior, Poller sent various work-related documents to her personal email account. While BioScrip asserts that this correspondence was for the purpose of utilizing the information in her new position at AOM, Poller contends that she frequently sent information to her personal email, as it was easier to work on her home computer, as opposed to her BioScrip-issued laptop. Poller notes that her direct supervisor, Sal Ralinelli, in fact had authorized the routine transfer of work-related documents to her home computer to facilitate printing.

BioScrip also contends that, in addition to the transfer of BioScrip-related information to her personal email, Poller downloaded information from her BioScrip laptop to a USB portable drive and "cleaned" her BioScrip computer, deleting tens of thousands of files, before returning it to BioScrip. Poller disputes this characterization, arguing instead that she merely attempted to delete personal matters, such as pictures from her 60th birthday, from the laptop. Regardless of the nature and content of these transfers and deletions, all parties agree that (1) Poller's last day at BioScrip was Friday, March 4, 2011, and (2) some emails to Poller's personal account were sent over the course of that weekend, before BioScrip had notice of her departure, which occurred on Monday, March 7, 2011.

**B.     Procedural Background**

Poller filed this action in New York County Supreme Court on March 4, 2011, and

BioScrip removed the case to the Southern District of New York on March 10.  (Dkt. No. 1.)

BioScrip next filed an Order to Show Cause, seeking to enjoin Poller from competing directly or

indirectly with BioScrip's business.  (Dkt. No. 3.)  After briefing and argument, Judge Deborah

Batts denied BioScrip's motion for a preliminary injunction.  (Minute Entry, Mar. 22, 2011.)

On April 22, 2011, BioScrip filed a Third-Party Complaint against AOM (Dkt. No. 25), and, on

April 27, 2011, BioScrip answered Poller's Complaint, asserting 11 counterclaims against Poller

and AOM (Dkt. No. 24).  BioScrip amended its counterclaims on May 12, 2011 (Dkt. No. 26),

and Poller and AOM answered BioScrip's amended counterclaims on June 16, 2011 (Dkt. Nos.

31, 32).  Also on June 16, AOM counterclaimed against BioScrip.  (Dkt. No. 31.)  BioScrip

answered AOM's counterclaim on July 5, 2011.  (Dkt. No. 33.)  After pursuing settlement with

Magistrate Judge Cott, Poller and AOM filed a motion for summary judgment on January 11,

2013.  (Dkt. No. 66.)  BioScrip opposed this motion and cross-moved for summary judgment on

February 8, 2013.  (Dkt. Nos. 74-75.)  Poller and AOM filed a joint opposition and reply on

March 7, 2013 (Dkt. No. 80), and BioScrip did the same on April 5, 2013 (Dkt. No. 84.)

## II.     Summary Judgment Standard

A court may grant a motion for summary judgment only when all of the parties'

submissions, read together, reveal that "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Wright v. Goord*, 554

F.3d 255, 266 (2d Cir. 2009).  "The moving party bears the burden of proving that there is no

genuine [dispute] of material fact."  *Read v. Town of Suffern Police Dep't*, No. 10 Civ. 9042

(JPO), 2013 WL 3193413, at *3 (S.D.N.Y. June 25, 2013) (citing *Zalaski v. City of Bridgeport*

*Police Dep't.*, 613 F.3d 336, 340 (2d Cir. 2010)).   The court must construe all facts, and resolve

all ambiguities, in the non-movant's favor.  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir.

2011).  A fact is "material" only if it will affect the outcome of the suit under governing law.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   Where no facts exist "from which a

reasonable inference could be drawn in favor of the non-moving party on a material issue of

fact," summary judgment is appropriate.  *Catlin v. Sobol*, 93 F.3d 1112, 1116 (2d Cir. 1996).

        Courts are required to deny a motion for summary judgment "where reasonable jurors

could disagree as to the proper result."  *Read*, 2013 WL 3193413, at *3.  Nevertheless, "[t]he

mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;

there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477

U.S. at 252.

## III.    Discussion

        In its Answer (Dkt. Nos. 24, 26), BioScrip asserted the following counterclaims:[3] breach

of contract (non-competition) ("Count I"); breach of contract (non-disclosure) ("Count II");

breach of fiduciary duties ("Count III"); breach of duty of loyalty ("Count IV"); violation of the

Computer Fraud and Abuse Act ("Count V"); unfair competition, also against AOM ("Count

VI"); misappropriation, also against AOM ("Count VII"); unjust enrichment, also against AOM

("Count VIII"); interference with contractual relations and prospective business advantage, also

against AOM ("Count IX"); and violation of New York's General Business Law § 349, also

against AOM ("Count X").  Additionally, BioScrip seeks permanent injunctive relief against

Poller and AOM.  In turn, AOM filed a counterclaim against BioScrip for unfair competition.

---

[3] These counterclaims are asserted against Poller only, unless otherwise noted.

Poller and AOM have moved for summary judgment on Poller's original declaratory judgment claim, as well as on all of BioScrip's counterclaims.  BioScrip has cross-moved for summary judgment on Poller's declaratory judgment claim, Counts I, II, and VI, and has moved for summary judgment on AOM's counterclaim.

The Court addresses each claim in turn.[4]

### A.     Enforceability of the RCA and Breach of Contract (Counts I and II)

Poller's declaratory judgment action and BioScrip's counterclaims for breach of contract derive from the terms of the RCA.  Central to these claims is the enforceability of the RCA's restrictions.  Poller argues that the RCA is unenforceable because it fails to reasonably protect BioScrip's legitimate interests when applied to Poller, as required by law.  In response, BioScrip contends that the agreement is narrowly tailored to protect its valid business interests and fails to impose an undue hardship on Poller.  Additionally, BioScrip argues that the undisputed facts demonstrate that Poller violated the terms of the RCA.

As discussed, the RCA includes non-compete, non-solicitation, and non-disclosure provisions.  These provisions present distinct issues.

### 1.     Legitimate Business Interests

As a general rule, "New York courts adhere to a strict approach to enforcement of restrictive covenants because their enforcement conflicts with the general public policy favoring robust and uninhibited competition, and powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood."  *Kelly v. Evolution Markets, Inc.*, 626 F.

---

[4] While the RCA has a forum selection clause, designating Delaware law in matters of "interpretation, application and enforcement," Delaware and New York law are indistinguishable with regard to the enforceability of restrictive covenants.  Accordingly, the parties cite both Delaware and New York law in their briefing of BioScrip's contract claims.  With respect to the tort claims, the parties agree that New York law applies.

Supp. 2d 364, 371 (S.D.N.Y. 2009) (citation omitted).  Accordingly, "[a]n employee agreement not to compete will be enforced only if 'it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee.'"  *Scott, Stackrow & Co., C.P.A.'s, P.C. v. Skavina*, 9 A.D.3d 805, 806 (3d Dep't 2004) (citations omitted); *accord  BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89 (1999) ("A restraint is reasonable only if it: (1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." (citations omitted) (emphasis in original)); *Elite Cleaning Co., Inc. v. Capel*, Civ. A. No. 690-N, 2006 WL 1565161, at *8 (Del. Ch. June 2, 2006) ("Under Delaware law, the courts will not enforce a noncompetition agreement 'that is more restrictive than an employer's legitimate interests justify or that is oppressive to an employee.'" (footnote omitted)).

With respect to the first prong of this reasonableness analysis, an employer's "legitimate" interests include: (1) the protection of trade secrets; (2) where the employer is exposed to "special harm" due to the "unique" nature of an employee's services; or (3) the goodwill of an employer's business.  *See Ken J. Pezrow Corp. v. Seifert*, 197 A.D.2d 856-57 (4th Dep't 1993).

"[A] trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'"  *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) (applying New York law) (quoting Restatement of Torts § 757 cmt. b, at 5 (1939)).  Courts examine several factors in determining whether information rises to the level of a trade secret, including:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Unisource Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d 269, 278 (E.D.N.Y. 2002) (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999)).  With respect to customer lists and information associated with customer preferences, even where some of that information may be publicly available, courts have held that "where a company's customers are not readily ascertainable, but must be cultivated with great effort and secured through the expenditure of considerable time and money, the names of those customers are [protectable] trade secrets." *Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 606 (S.D.N.Y. 2001) (quotations and citations omitted).  Nevertheless, "a former employee may not be enjoined from soliciting his or her former employer's customers where the names and addresses of potential customers are readily discoverable through public sources."  *Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F. Supp. 547, 557 (E.D.N.Y. 1995) (citations omitted); *but see Haber*, 188 F.3d at 46 ("Numerous cases applying New York law have held that where, as here, it would be difficult to duplicate a customer list because it reflected individual customer preferences, trade secret protection should apply." (citations omitted)).  In parsing the customer list issue, courts examine whether the solicitation of an employer's customers constitutes the "product of casual memory" or coincidence, as opposed to "a physical taking or studied copying," characterizing the latter as "not necessarily [] a violation of a trade secret, but as an egregious breach of trust and confidence while in plaintiffs' service."  *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 392 (Ct. App. 1972)

11

(citations omitted).  Generally however, the *sine qua non* of whether a customer list constitutes a trade secret lies in whether "the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products," or, by contrast, "the customers are not known in the trade or are discoverable only by extraordinary efforts [and the] customers' patronage had been secured by years of effort and advertising effected by the expenditure of substantial time and money." *Id.* at 392-93.   Whereas the former circumstance will not support trade secret protection, in the latter situation, "courts have not hesitated to protect customer lists and files as trade secrets." *Id.* (citations omitted); *see also Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) ("[A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." (quoting *Imperial Chem. Indus. Ltd. v. National Distillers and Chem. Corp.*, 342 F.2d 737, 742 (2d Cir.1965) (quotations and citation omitted)).

    With regard to the second way in which an employer's interests may legitimately sustain a non-compete clause, such as the one at issue here, courts recognize employers' viable interests in protecting themselves from "competition by a former employee whose services are unique or extraordinary." *BDO Seidman*, 93 N.Y.2d at 389 (citation omitted).  "[T]he question of whether one's services are unique is case-specific," *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 189 (S.D.N.Y. 2011), and the crux of the inquiry is whether the services rendered by a given employee are "not simply of value to the employer, but [] may also truly be said to be special, unique or extraordinary," *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70 (2d Cir. 1999).  Such unique services tend to be found in "categories of employment where the services are dependent

on an employee's special talents," such as "musicians, professional athletes, actors and the like."
*Id.*  The *Ticor* court went on to discuss cases where unique services had previously been found, such as where an acrobat performed a specific act or where a journalist wrote feature articles for the daily press.  *Id.* at 71.  And while it is not required that an employee "should be the only 'star' of his employer, or that the business will grind to a halt if the employee leaves," *id.*, being of key import or value will not automatically render one's services unique within the meaning of this limited exception.  *See, e.g.*, *DataType Int'l, Inc. v. Puzia*, 797 F. Supp. 274, 283 (S.D.N.Y. 1992) ("It cannot be said that DataType is exposed to special harm because of the unique nature of Puzia's services.  Puzia is a salesman.  To be sure, he is a very good salesman; but there is nothing unique about the nature of his services.").

Finally, "[e]ven where . . . there is no showing that a former employee has obtained a competitive advantage through the misappropriation of confidential customer information or that the employee possessed unique or extraordinary abilities, the employer retains 'a legitimate interest in preventing former employees from exploiting . . . the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment.'"  *Scott, Stackrow & Co.*, 9 A.D.3d at 806 (quoting *BDO Seidman*, 93 N.Y.2d at 392). This employer interest, however, will not be construed as legitimate if the covenant "seeks to bar the employee from soliciting or providing services to clients with whom the employee never acquired a relationship through his or her employment or if the covenant extends to personal clients recruited through the employee's independent efforts."  *Id.* (citation omitted).

Here, BioScrip asserts that all three of the aforementioned legitimate interests are met, contending that (1) the information Poller sent to her personal email account constituted trade secrets; (2) Poller's qualities as a salesperson rendered her services unique; and (3) Poller

absconded with BioScrip's goodwill, exploiting it on behalf of her new company, AOM.  By contrast, AOM argues that (1) the information obtained by Poller was not protectable as a trade secret; (2) Poller is not a "unique" employee in the legal sense; and (3) the overbreadth of the agreement nullifies any legitimate interest it may have in protecting BioScrip's customer goodwill.

As noted, in determining whether material warrants trade secret protection, New York courts examine several factors, including the way in which the information was treated, compiled, and accessed within a given business.  And while customer lists do not necessarily trigger trade secret protection, where information is procured at great expense and effort by an employer, and includes non-public aspects that are not easily replicated, trade secret protection may attach.  *See, e.g.*, *Ivy Mar Co.*, 907 F. Supp. at 556-57 ("[W]here a company's customers are not readily ascertainable, but must be cultivated with great effort and secured through the expenditure of considerable time and money, the names of those customers are protectible trade secrets." (citations omitted)).

BioScrip has raised an issue of material fact as to whether compilations of its referral sources (generally, doctors or nurses), together with corresponding patient names, treatments, dosages, insurance information, hospitals, and territory area are protectable as trade secrets. Poller and AOM highlight the publicly available nature of doctors' names in defending the accessible nature of the materials at issue, contending that such availability eliminates the possibility of trade secret protection.  *See, e.g.*, *Haber*, 188 F.3d at 44 ("The Magistrate Judge concluded that the list of *companies* to whom North Atlantic's TMI division sold was not a trade secret.  In this respect, the Magistrate Judge found that North Atlantic had not proven that such a list 'could not have been developed by reviewing, among other public sources, trade publications

available to anyone who availed himself or herself [of] such reference.'"); *see also Gemmy Indus. Corp. v. Chrisha Creations Ltd.*, No. 04 Civ.1074 (RWS), 2004 WL 1406075, at *12 (S.D.N.Y. June 23, 2004), *vacated and remanded*, 452 F.3d 1353 (Fed. Cir. 2006) ("Price lists, product samples and 'marketing plans' are all items that are not, as a matter of law, protected as trade secrets." (citations omitted)).  While practitioner information is certainly publicly available, the onerous compilation of that information, through the expenditure of time, money, and labor, and subsequent pairing of that information with patient records, preferences, and needs could indeed rise to the level of a trade secret.  *See Haber*, 188 F.3d at 45 ("By contrast, the Magistrate Judge determined that the *identities of individual contact people* with whom Haber dealt while at North Atlantic or TMI were protectable trade secrets.  The Magistrate Judge began his analysis for this second conclusion by determining that information on specific contact people was 'not readily available' to others in the industry.  That is, Haber generated the list of specific contact people—the people who required the customized technology produced by TMI and North Atlantic's TMI division—over the fifty years he had worked in the industry, more than half of which he spent at TMI." (emphasis in original)).

Here, BioScrip has raised a triable issue of fact as to the manner in which records of referral sources and patients were obtained, developed, and maintained—and, consequently, as to the effort expended in doing so.  For example, Saracco explained in his deposition that BioScrip would help its salespersons "identify the specialists in a territory, because there's a very narrow group of specialty kinds of doctors that would prescribe these therapies."  (Ex. 41, at 81:11-14.) Saracco also noted that BioScrip itself would sometimes purchase information on specialties, purchase physician lists, or pay to attend national meetings or conferences as a way in which to contact practitioners.  (*Id.* at 81:18-82:19.)  Moreover, even though such conferences or

physician lists might be available to BioScrip's competitors through similar avenues, BioScrip expended time, money, and effort in obtaining those lists, cultivating relationships with given doctors, and creating databases that listed information such as "customer files, customer referrals, revenue, profitability, margin analysis, therapy-specific reports for drug-prescribed type of access—in the case of IVIG, whether it's intravenous IVIG or subcutaneous—the names of the referral sources, the managed care contract that applies to each of the patients, our pricing." (*Id.* at 77:18-78:4 (Saracco discussing his conception of the meaning of "confidential information" as defined in the RCA).)  Poller herself admits that on a given compilation of a sales commission report that includes—in addition to a doctor or nurse's name as a referral source—a patient's name, when a patient started, was billed, and began service, together with a doctor revenue code, therapy type, revenue class, nursing type, and total associated revenue, nothing other than the referring practitioner's name is public.  (*See* Ex. 37, 278:3-21 (discussing Ex. 15).)

AOM and Poller argue that since all of the confidential patient information could have been gleaned from approaching doctors or other practitioners through publicly available sources, it is, *a fortiori*, non-protectable as a trade secret.  Moreover, they add that to the extent that such compilations reflect patient preferences or statuses, such information could constitute "remembered information," which, even where it reflects "specific needs and business habits of particular customers[,] is not confidential." *Tactica Int'l*, 154 F. Supp. 2d at 607 (quoting *Catalogue Serv. of Westchester, Inc. v. Henry*, 107 A.D.2d 783, 784 (2d Dep't 1985) (quotations and citations omitted)); *see also Levine v. Bochner*, 132 A.D.2d 532, 533 (2d Dep't 1987) ("The use of information about an employer's customers which is based on casual memory is not actionable." (citation omitted)).  BioScrip, however, has raised a triable issue of fact on the

16

manner in which such information was gathered, the effort expended in doing so, and the resultant value of the compilation thereof.  *See Defiance Button Machine Co. v. C&C Metal Products Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985) ("A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." (citations omitted)).  Accordingly, just because referral sources may be found through public channels does not negate the effort potentially expended in cultivating those sources.  Moreover, if the cited exhibits are any indication, the status of a given patient, as associated with a given doctor, within a list of hundreds, may not be the product of "casual memory" as Poller and AOM argue.  Additionally, BioScrip has raised an issue of material fact as to the treatment of such information as confidential within the company.  (*See, e.g.*, Ex. 37, at 330:20-331:9 (Poller discussing how she was the only person with access to her particular referral and patient list and noting its password protection); Ex. 42, at ¶ 20 (noting that "substantial measures" are taken by BioScrip to keep its "confidential information concerning its customers and referral sources secret").)

Thus, BioScrip has raised a genuine issue of material fact as to whether its information concerning patients, referral sources, and treatments, constitutes a trade secret, as the record reflects that (1) the compilation of the information is largely specific to the home infusion business; (2) only certain employees have access to the customer files, records, and insurance information cited by Saracco as confidential; (3) BioScrip secured said information on a password-protected database; (4) the information, as compiled, in the hands of competitors very well may constitute a expeditious, surefire way to target referral sources; (5) BioScrip expended time, labor, and money in developing the compilation of referral sources; and (6) the

information, while in some ways publicly available in the sense that practitioner names are public, is not necessarily easily duplicable or attainable in the form that BioScrip maintains it. *See, e.g.*, *DoubleClick Inc. v. Henderson*, No. 116914/97, 1997 WL 731413, at *4-5 (N.Y. Sup. Ct. Nov. 7, 1997) (discussing the Restatement of Torts, § 757, comment b factors applied by New York courts in determining whether information is worthy of trade secret protection).  And while AOM and Poller argue that if the information is proprietary or confidential, it is confidential to the HIPAA-protected patients, but not to BioScrip, these two categories are not necessarily mutually exclusive.   While the information concerning patient treatment and insurance information is surely confidential to those patients implicated, this fact does not negate the potential proprietary interest BioScrip may have "in safeguarding that which has made [its] business successful and to protect [itself] against deliberate surreptitious commercial piracy." *Reed, Roberts Associates, Inc. v. Strauman*, 40 N.Y.2d 303, 308 (Ct. App. 1976).  Accordingly, BioScrip may have a legitimate interest in maintaining its trade secrets, which may in turn justify the RCA.

BioScrip also advances alternative justifications for the RCA:  namely, (1) that Poller is a "unique" employee, who, as a professional, provides extraordinary services and (2) the protection of the goodwill of BioScrip's business, which is inextricably tied to its relationships with its referral sources and patients.  As for the first of these additional justifications, while Poller is clearly a highly successful salesperson, her services are not unique or extraordinary in the way in which an artisan's or performer's services may be; instead, they are merely of "high value" to her employer.  *See Quandt's Wholesale Distributors, Inc. v. Giardino*, 87 A.D.2d 684, 684 (3d Dep't 1982) ("Nothing more is claimed by plaintiff than that defendant Giardino was a very effective and well-trained salesman, familiar with plaintiff's customers and business

methods.  This may tend to establish that he was 'of high value to his employer'; it does not

establish his services as unique."  (quotations and citation omitted)).  Therefore, Poller's so-

called "unique" ability to cultivate referral sources is not unique in the legal sense, and thus, does

not constitute a legitimate interest that could justify the RCA.  As for BioScrip's interest in its

referral sources and patients' goodwill, the "desire to protect its goodwill that it fostered with

customers constitutes a legitimate business interest."  *Kelly*, 626 F. Supp. 2d at 372 (citation

omitted).   In many ways, "the goodwill of the salesman's relationship with the customer is to a

degree an asset of the employer."  *Ecolab, Inc. v. K.P. Laundry Mach., Inc.*, 656 F. Supp. 894,

899 (S.D.N.Y. 1987).  For example, even where the goodwill is developed by the salesperson,

that development "is done for the benefit of the employer under a duty of loyalty and in return

for compensation paid to the salesman by the employer."  *Id.*  Where, as here, the salesperson

develops continuous relationships over the course of working for an organization, those

longstanding relationships "can be reasonably viewed as legitimate property interests of the

employer which are entitled to contractual protection so long as the protective contracts are of

reasonable scope."  *Id.*

　　　　In sum, although Poller's success as a salesperson does not render her "unique" in the

sense that her value could justify the non-compete and non-solicitation aspects of the RCA,

BioScrip's interest in maintaining what are potentially protectable trade secrets and its customer

goodwill are both legitimate.  It is axiomatic, however, that non-compete clauses and non-

solicitation provisions, even where protecting legitimate interests, must be reasonably limited

both temporally and geographically in order to withstand judicial scrutiny, as reasonableness will

not be found where restrictive covenants act to unreasonably limit trade and burden an

individual's livelihood.  *See* Employment Law, Practitioner Treatise Series, Vol. 2, § 8.9 (2009

4th Ed.) ("A covenant not to compete must be reasonable in duration, activity, and geographic limits in order to be enforceable.").

Here, the non-compete portion of the RCA purported to limit Poller from selling or participating in the sale of IVIG products for one year in her "Territory," with that territory defined as the New York Metropolitan Area, including Bronx, Kings, New York, Queens, and Richmond counties, and Long Island, constituting Nassau and Suffolk counties.  This restriction was to remain in place for one year.  Courts have routinely held that limitations of one year, when coupled with corresponding geographic limitations, can be reasonable.  *See, e.g.*, *BDO Seidman*, 93 N.Y.2d at 393 (upholding a restraint limiting Defendant from serving BDO clients for 18 months in the limited geographic area of Buffalo as reasonable); *Battenkill Veterinary Equine v. Cangelosi*, 1 A.D. 3d 856, 858 (3d Dep't 2003) (upholding three-year, 35-mile restriction on practicing equine veterinary medicine where the geographical restriction was narrower than veterinarian's service area and the covenant only prohibited her from practicing her specialty, rather than from practicing at all); *Mattern & Associates, L.L.C. v. Seidel*, 678 F. Supp. 2d 256, 266 (D. Del. 2010) ("The court notes at the outset the reasonable nature of the 100–mile geographic limitation and two-year duration imposed upon Seidel by this provision." (footnote omitted)).  Here, as BioScrip points out, Poller is not prohibited by the non-compete clause from working in a similar capacity for AOM as she did for BioScrip; she is prohibited from doing so only within New York and Long Island.  AOM also provides services in New Jersey and Connecticut; Poller therefore presumably could have competed with BioScrip in those markets during the one-year prohibition period.  Accordingly, as the non-compete aspect of the RCA is limited in duration and geographic scope, it is a reasonable limitation given the

legitimate business interests BioScrip maintained in its confidentiality and information potentially protectable as a trade secret.

Second, the RCA also purports to limit Poller's ability to solicit any employee or contractor from leaving BioScrip, or engage in any business-related communication or solicitation for the purpose of inducing a BioScrip customer to cease doing business with BioScrip or displacing BioScrip as a service provider.  While courts have recognized the legitimate interest that companies maintain in safeguarding their good will—an interest that may properly be safeguarded through a reasonable non-solicitation provision in an RCA—such provisions will be "considered overbroad if the former employee had not personally served those customers before and if the individual had never represented the firm's goodwill to those customers."   Employment Law, Practitioner Treatise Series, § 8.10 (footnotes omitted)). Moreover, "[a] restriction also may not include customers who were served outside the employee's period of employment."   *Id.*; *accord  Scott, Stackrow & Co.*, 9 A.D.3d at 806 ("A covenant will be rejected as overly broad, however, if it seeks to bar the employee from soliciting or providing services to clients with whom the employee never acquired a relationship through his or her employment or if the covenant extends to personal clients recruited through the employee's independent efforts." (citation omitted)).  Here, though limited temporally to 24 months, the non-solicitation aspect of the agreement purports to prohibit Poller from soliciting any BioScrip client or referral source, regardless of whether her relationship with that client predates her employment with BioScrip.  This type of overbreadth is disfavored by courts, especially given the vital employee interests associated with establishing a livelihood.  Where courts find restrictions to be unreasonable, however, they may "blue pencil the covenant to restrict the term to a reasonable [] limitation, and grant partial enforcement for the overly broad

restrictive covenant."  *Unisource*, 196 F. Supp. 2d at 277 (quotations and citation omitted); *see also BDO*, 93 N.Y.2d at 395 ("The time and geographical limitations on the covenant remain intact.  The only change is to narrow the class of BDO clients to which the covenant applies. Moreover, to reject partial enforcement based solely on the extent of necessary revision of the contract resembles the now-discredited doctrine that invalidation of an entire restrictive covenant is required unless the invalid portion was so divisible that it could be mechanically severed, as with a 'judicial blue pencil.'  The Restatement (Second) of Contracts rejected that rigid requirement of strict divisibility before a covenant could be partially enforced.  Thus, we conclude that severance is appropriate, rendering the restrictive covenant partially enforceable." (internal citations omitted)).

Here, in light of BioScrip's aforementioned interest in maintaining client goodwill, the 24-month non-solicitation restriction may indeed be valid, if *limited* to those client-relationships that Poller developed while in BioScrip's employ.  *See, e.g.*, *USI Ins. Servs.*, 801 F. Supp. 2d at 188 (rejecting argument that 24-month non-solicitation provision for insurance salesman was unreasonable and citing similar cases in insurance industry maintaining like 24-month restrictions).  The Court will not, however, enforce the non-solicitation aspect as written, regardless of BioScrip's legitimate interest in maintaining its goodwill, because to limit Poller from soliciting those clients she developed on her own, or before her employment with BioScrip, would be *per se* unreasonable.

### 2.     Undue Hardship and Public Policy

Even where a company's interests are legitimate and reasonably protected by a restrictive covenant, courts will decline to enforce restrictive covenants where they impose an undue

hardship or are deleterious to public policy—facts which Poller and AOM contend militate against enforcement here.

Poller argues that because she is a 63-year-old woman who "has spent the majority of her professional life as an IVIG salesperson in the metropolitan New York area," the RCA imposes an undue hardship. The Court disagrees. With the non-solicitation clause limited to those clients that Poller developed during her employment with BioScrip and the non-compete clause limited to the New York metropolitan area and temporally by one year, Poller is not unduly burdened. Even under the terms of the agreement, she is not precluded from selling IVIG in New Jersey, Massachusetts, Connecticut, Rhode Island, and other neighboring states. Moreover, Poller could presumably solicit non-IVIG clients, provided that those clients were not those that she developed relationships with solely during her employment with BioScrip. Additionally, Poller repeatedly stated that many of the relationships with doctors she solicited at BioScrip predated her employment there. Accordingly the RCA's solicitation limitations, so long as they are only applicable to those clients or referral sources developed exclusively at BioScrip, would not work to preclude Poller from earning a living. It is also undisputed that Poller's current employment agreement with AOM includes a provision entitling Poller to her base salary of $160,000, even in the event of an injunction barring Poller from working for AOM at all. (Ex. E-3, at ¶ 9). *Compare USI*, 801 F. Supp. at 190 ("Although the parties do not specifically focus on undue hardship, as noted above, USI is not seeking to preclude Miner from working as an insurance producer for IOA. USI instead seeks only to preclude Miner from soliciting or servicing former USI clients. USI does note, however, that Miner's employment agreement with IOA guarantees him a salary and an equity stake in the business. Accordingly, the Court finds that this prong favors USI."), *with Elite Cleaning*, 2006 WL 1565161, at *8-9 (finding a two-year

23

noncompetition agreement unenforceable where it restricted an "unskilled" worker's ability to earn a living, despite the fact that his former employer's interest in "disintermediation" was "minor" and the former employee had received "no specialized training," was not "highly compensated," and had "not been shown to have been trying to take business away from [his former employer] or to have caused that effect" (footnote omitted)).  Thus, given its reasonable temporal limitations, Poller's ability to sell IVIG in neighboring geographic areas, and the Court's reading of the non-solicitation clause as limited to those clients with which Poller developed a relationship exclusively during her time at BioScrip, the RCA does not impose an undue hardship on Poller.

AOM and Poller also assert that the RCA's restraints are "injurious to the public given the nature of the business at issue," namely, "the provision of home infusion therapy to patients with chronic illnesses."  (Pl.'s Mem. at 16.)   According to Poller, enforcing the RCA would "curtail the options presented to doctors and patients with respect to their choice of home infusion therapy providers."  (*Id.*; *see also* Consolidated Memorandum of Law in Opposition to BioScrip, Inc.'s Cross-Motion, Dkt. No. 80 ("Pl.'s Rep."), at 9 ("The true public policy question at issue here is patient choice.  And the enforcement of the RCA against Poller would unduly crib [sic] a patient's ability to move to the provider of his or her choosing.").)   Poller and AOM fail to advance any argument as to how or why patient choice is curbed by one salesperson's restriction.  Presumably patients are always free to contact their doctors for a different home infusion referral if they are unhappy with their current provider and those doctors' awareness of home infusion providers and alternatives cannot reasonably be construed as dependent on continuous contact with Poller.

24

3.       **Enforceability**

Finally, Poller and AOM present several additional arguments against enforceability, including the supposed "drastic reduction" in compensation that Poller suffered in the wake of the RCA's imposition.  Poller argues that changes to the conditions of her employment, in concert with the unilateral imposition of the RCA, constituted an exploitative action on BioScrip's part, which took advantage of Poller's lack of bargaining power as compared to that of her employer.  First, Poller argues that BioScrip "dressed up" the RCA "with claims that it was offering continued employment and an additional week of severance in the event of termination," a "sales pitch [that] was belied by the fact that BioScrip was simultaneously imposing a new compensation plan that drastically reduced Poller's earnings."  (Pl.'s Mem. at 15.)  Second, Poller argues that "changes in the terms and conditions of Poller's employment after her execution of the RCA further militate against enforcement," citing the aforementioned reduction in compensation, the introduction of a cross-selling initiative that Poller believed jeopardized her relationships with her referral sources, the discontinuance of employer matching within employees' 401k plans, and an increase in healthcare premiums.  In response, BioScrip notes that Poller was given months to review the RCA with her attorney—a time during which she interviewed for another job—and continued working for BioScrip for two years in the wake of the RCA's imposition, constituting sufficient consideration for the agreement.  (Memorandum of Law in Support of BioScrip, Inc.'s Cross Motion for Summary Judgment, Dkt. No. 71 ("Def.'s Mem."), at 22.)

First, the fact that a restrictive covenant agreement is a condition of future employment with a given company does not automatically render such an agreement coercive and unenforceable.  *See Ecolab*, 656 F. Supp. at 898 ("The other defenses fail.  The fact that the

employment agreement with Ecolab was a condition of employment with Ecolab does not mean that those were coerced, unenforceable agreements.").  Moreover, an at-will employee's continued employment can constitute sufficient consideration to support an enforceable contract. *See, e.g.*, *Zellner v. Stephen D. Conrad, M.D. P.C.*, 183 A.D.2d 250, 256 (2d Dep't 1992) ("Because in at-will employment the employer has the right to discharge the employee (or, as here, an independent contractor providing services under a similar arrangement), without cause, and without being subject to inquiry as to his or her motives forbearance of that right is a legal detriment which can stand as consideration for a restrictive covenant." (citation omitted)); *see also Gazzzola-Kraenzlin v. Westchester Med. Grp., P.C.*, 10 A.D. 3d 700, 782 (2d Dep't 2004) ("Under these circumstances, the plaintiff's continued employment by the defendant until December 31, 2002, constituted good and sufficient consideration for the restrictive covenants, notwithstanding the at-will nature of the employment relationship." (citation omitted)); *Research & Trading Corp. v. Powell*, 468 A.2d 1301, 1305 (Del. Ch. 1983) ("The Court finds there was sufficient consideration at the time of the signing of the covenant to support an enforceable restrictive covenant.  Although Powell now alleges that the job was not as beneficial as he thought it would be, that type of argument will not defeat the validity of the covenant.  Powell was told he would lose the position if he did not sign. It is inconsequential that the new position did not subsequently fulfill his expectations.").  Third, changes in compensation do not necessarily bar enforcement restrictive covenants.  *See, e.g.*, *IDG USA, LLC v. Schupp*, No. 10 Civ. 76S, 2010 WL 3260046, at *12 (W.D.N.Y. Aug. 18, 2010), *vacated in part on unrelated grounds*, 416 Fed. App'x 86 (2d Cir. 2011) ("There is no dispute that IDG reduced Schupp's annual salary from that stated in the NCA.  Schupp contends it is 'hornbook law' in New York that this breach renders the restrictive covenants unenforceable.  Yet the cases it cites in support

do not apply New York law. . . . It has also been held that when an employer exercises this right

to modify an at will employee's contract by changing that employee's terms of compensation,

and the employee chooses to remain in the employer's employ after being advised of that

change, that employee is deemed to have acquiesced to the contract modification." (citations

omitted)).

In support of her position that the totality of circumstances, including Poller's "drastic

reduction in compensation" in the wake of the RCA, counsels against enforceability, Poller cites

*Iron Mountain Info. Mgmt. v. Taddeo*, where a court in the Eastern District of New York,

applying Massachusetts law, held that "[i]t is well-settled under Massachusetts law that '[e]ach

time an employee's employment relationship with the employer changes materially such that

they have entered into a new employment relationship a new restrictive covenant must be

signed.'" 455 F. Supp. 2d 124, 132-33 (E.D.N.Y. 2006) (citations omitted) (alteration in

original). On that basis, the *Taddeo* court declined to issue a preliminary injunction enforcing a

restrictive covenant, noting that significant changes to an employee's rate of compensation or

sales area imposed subsequent to the signing of a restrictive covenant agreement, when "far

reaching," tend to "suggest that the parties ha[ve] abandoned their old arrangement and ha[ve]

entered into a new relationship." *Id.* at 133 (quotations and citation omitted). Even if the Court

were to adopt this aspect of Massachusetts law, it does not appear from the factual record that the

RCA was imposed as a bullying tactic to force Poller into accepting lower compensation. *See*

*Renaissance Nutrition, Inc. v. Jarrett*, No. 08 Civ. 800S, 2012 WL 42171, at *5-6 (W.D.N.Y.

Jan. 9, 2012) ("Defendants argue that the agreement is invalid because it was procured through

coercion and overreaching. In support of this argument, they point to several facts: it was

presented to them after an all-day meeting; their roles, responsibilities, and compensation did not

27

change after the agreement was signed; they were provided only one day notice; and they risked demotion if they did not sign. . . . With no legal authority on point, this Court is not prepared to rule, as a matter of law, that Renaissance's actions were so inappropriate as to warrant invalidating the contract, especially given the unconvincing reasons provided by Defendants."). And while the parties disagree as to the amount of compensation that Poller earned in the two years between signing the RCA and her resignation (*see* BioScrip's Counterstatement to Plaintiff's Local Rule 56.1 Statement, Dkt. No. 78 ("Def.'s CSMF"), at ¶ 78), the Court is inclined to agree with BioScrip that "Poller's continued employment with BioScrip, without protest, for almost two years after executing the covenants belies any presently convenient assertion that BioScrip's purported reduction of her pay/benefits somehow vitiates the Agreement." (Def.'s Mem. at 23.)  Moreover, while BioScrip admits that it applied a firm-wide change to its compensation structure in 2009 for its infusion therapy sales force (Ex. B. at 156:20-157:17; Ex. I), Poller has provided no evidence that the reduction in her total compensation from 2007-2010 was the result of the firm-wide changed compensation structure, which did not necessarily "mean that Poller's commissions would decrease." (Def.'s Mem. at 21.)  Instead, the commission structure was altered to reward new business acquisition as opposed to the maintenance of older referral sources.  Accordingly, after the plan's imposition, a given sales representative's commission depended on that "sales representative and their success at obtaining new business." (*Id.*; *see also* Ex. I.)

Accordingly, the RCA is not unenforceable as a matter of law, as the circumstances do not suggest that Poller, as a victim of unequal bargaining power and limited other employment prospects, was forced into an RCA and later subjected to a drastic alteration of her rights as an

employee.  On the contrary, Poller took months to sign the agreement, consulted with her attorney over its terms, and remained as an employee for nearly two years in its wake.

### 4.     Breach of Contract Claims

Having determined that (1) there is an issue of material fact as to whether BioScrip's referral and patient compilations merit trade secret protection; (2) BioScrip has a legitimate interest in protecting its customer goodwill; (3) the non-compete and modified non-solicitation clauses of the RCA are reasonable in duration and scope; and (4) public policy concerns, undue hardship, and the conditions surrounding the RCA's imposition do not render it unenforceable as a matter of law, the Court now turns to BioScrip's argument that summary judgment in its favor on its two breach of contract claims deriving from the RCA is warranted at this stage.

First, with respect to the non-compete provision, if BioScrip ultimately is found to possess a legitimate trade secret interest in its patient and referral list compilations, Poller will have breached its terms, having worked as an IVIG salesperson for a competitor in the same territory where she worked as a representative for BioScrip.  Second, with respect to the non-solicitation aspect of the RCA, even recognizing BioScrip's legitimate interest in its customer goodwill, there remains an issue of material fact as to whether Poller breached this provision, as the record presents conflicting narratives with respect to Poller's knowledge and development of referral sources prior to and during her time at BioScrip.  As noted, Poller has been in the chronic care industry for many years, and some of her referral sources predate her time at BioScrip.  It is axiomatic that BioScrip cannot legitimately prevent Poller from cultivating and maintaining referral sources that predate her relationship with it.  Accordingly, there remains an issue of material fact as to whether Poller breached the non-solicitation clause, as modified by the Court, in soliciting various sources, as there is a genuine dispute as to the extent to which Poller knew

certain practitioners whom she solicited on behalf of AOM before her employment with BioScrip.  To summarize, while breach of the non-compete is conceded, there remains an issue of material fact as to its enforceability—as BioScrip may or may not have a legitimate trade secret interest in its referral sources and patients.  Additionally, despite BioScrip's legitimate interest in protecting the goodwill of its referral sources through the non-solicitation clause, there is an issue of material fact as to the extent to which Poller solicited practitioners whom she knew before her employment at BioScrip, such that those individuals could not legitimately be construed as business assets of BioScrip.

Finally, as noted, BioScrip also advances a breach of the non-disclosure portion of the RCA (Count II), which provides, in pertinent part, that Poller was to "keep secret and retain in strictest confidence, and shall not use for [her] benefit or the benefit of others, except in connection with [BioScrip's business] and the affairs of [BioScrip], all confidential and proprietary matters relating to [BioScrip] and [its business] learned by [Poller] . . . from [BioScrip]."  (Ex. 3 at 2.)  Such confidential information is defined as, *inter alia*, "customers, clients, suppliers, sources of supply and customer lists," and "sales figures, contracts, agreements, and undertakings with or with respect to customers."  (*Id.*)  Here, it is undisputed that Poller sent some of the aforementioned information to her personal email account from her BioScrip account during the weekend of March 4-6, 2011.  However, the extent to which she used this information for her own benefit, or for the benefit of AOM, as proscribed by the provision, remains a genuinely disputed issue of material fact.  (*See, e.g.*, Ex. C at 241:5-242:14 ("The reason I have this was that so I just know the patients and know how they should, you know, be taken care of.  And I have never used this; I have never shared information with anybody."); Ex. D at 115:9-116:8 (Dr. Jampolis noting in his deposition that AOM looked at

Poller's revenue as a salesperson before hiring her but not her customer or patient records, noting that he "would have heard if Judy or Ann [referring to Ann Martens, AOM's director of sales] took BioScrip information"); Ex. E at 154:16-23 (Sherri Benson, Executive Vice President of AOM, noting that she never knew of Poller utilizing anything at AOM from her time at BioScrip except her commission report); Ex. F at 131:5-23 (Ann Martens noting that she was unaware of Poller taking any BioScrip information for use at AOM and stating that she knew Poller had returned her phone and laptop upon her resignation from BioScrip).)

Accordingly, Poller's motion for summary judgment and BioScrip's cross-motion on Poller's declaratory judgment act claim and on Counts I and II are denied.

### B.      Breach of Fiduciary Duties and Duty of Loyalty (Counts III and IV)

BioScrip asserts breach of fiduciary duty and breach of the duty of loyalty counterclaims against Poller, alleging that Poller, while a BioScrip employee, misappropriated confidential and proprietary information from BioScrip, failed to disclose various sales opportunities to BioScrip, securing them on behalf of AOM, wiped her computer with the aid of AOM's Director of Sales, and attempted to divert business opportunities from BioScrip to AOM.  Poller has moved for summary judgment on these counterclaims, arguing that BioScrip's allegations involve actions taken after she had already resigned from BioScrip.

Employees owe duties of good faith and loyalty to their employers while carrying out their duties.  *See DoubleClick*, 1997 WL 731413, at *6 ("It is well-established in the law of this state that an employee 'is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" (citation omitted)); *accord Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 659 (S.D.N.Y. 2005), *aff'd sub nom. Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006)

31

("Under New York law, an employee owes a duty of good faith and loyalty to his employer." (citations omitted)).  These duties include those "corollary duties of an agent to disclose information that is relevant to the affairs of the agency entrusted to him and to refrain from placing himself in a position antagonistic to his principal concerning the subject matter of his agency."  *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010).  Nevertheless, an employee is not prohibited from "making arrangements or preparations to compete with his principal before terminating his agency, provided he does not act unfairly or injure his principal." *Id.* (footnote omitted).  Accordingly, while mere advisement to one's clients of a future planned departure from one's employment would not constitute a breach of loyalty or fiduciary duties, the solicitation of those clients while still employed would constitute such a breach.  *See Am. Fed. Grp., Ltd. v. Rotherberg*, No. 91 Civ. 7860 (THK), 2003 WL 22349673, at *8 (S.D.N.Y. Oct. 14, 2003) ("There is no question that Rothenberg advised many of his clients of his impending departure from AFG.  This raises no issue of a breach of fiduciary duty.  However, it is also apparent that some of the clients were 'solicited' by Rothenberg after he announced his resignation, but prior to his actual departure from AFG."); *see also Duane Jones Co. v. Burke*, 306 N.Y. 172, 188-89 (Ct. App. 1954) ("The inferences reasonably to be drawn from the record justify the conclusion—reached by the jury and by a majority of the Appellate Division—that the individual defendants-appellants, while employees of plaintiff corporation, determined upon a course of conduct which, when subsequently carried out, resulted in benefit to themselves through destruction of plaintiff's business, in violation of the fiduciary duties of good faith and fair dealing imposed on defendants by their close relationship with plaintiff corporation.").

A breach of fiduciary duty, and generally in tandem, of loyalty, "occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets,

misuse of confidential information, solicitation of employer's customers before cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, or usurpation of the employer's business opportunity." *Beard Research*, 8 A.3d at 602 (footnote omitted). Notably, these duties are "not dependent upon an express contractual relationship, but exists even where the employment relationship is at-will." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 521 (S.D.N.Y. 2011) (citations omitted). While these duties, as a general rule, apply only to an employee's performance of her job as an agent of her employer, the Second Circuit, and New York, both recognize that "an employee's fiduciary duty may continue after termination of the employment relationship." *Am. Fed. Grp.*, 2003 WL 22349673, at *13 (citing cases). This duty may include "the specific duty not to divert business in which a former employer has the requisite 'tangible expectancy,' and the duty not to exploit to the former employer's detriment specific information obtained during the employment that was either technically confidential or that was available to the fiduciary only because of the employment." *Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 914 (2d Cir. 1998) (citations omitted); *accord Abraham Zion Corp. v. Lebow*, 593 F. Supp. 551, 569 (S.D.N.Y. 1984), *aff'd*, 761 F.2d 93 (2d Cir. 1985) ("Harry Lebow was not bound by a contractual agreement to refrain from disclosing information. It cannot be disputed, however, that an employee has a fiduciary duty that exists independent of any contract between the parties to refrain from such conduct in certain circumstances." (citations omitted)).

Given the nebulous nature of an industry based primarily on personal relationships that develop between chronic care sales representatives and their referral sources, it cannot be said that BioScrip had an "ongoing," "indefinite," or "tangible expectancy" in the "business of its existing customer base." *See, e.g.*, *Am. Fed. Grp., Ltd.*, 2003 WL 22349673, at *15. Thus, any

successful breach of fiduciary duty or duty of loyalty claims will necessarily derive from Poller's

alleged pilfering of confidential, proprietary information obtained in the course of her BioScrip

employment for her own and AOM's benefit.  Accordingly, the Court first examines the

documents Poller took from her BioScrip account and laptop.  The information Poller forwarded

herself is as follows:

- Email 1: On March 1, 2011, Poller sent a 48-page commission report, listing her commissions, together with the patient name, date the patient started treatment, when the patient was billed, the doctor revenue code, therapy type, revenue class, and nursing and total revenue, from her BioScrip account to her personal email account.  (Ex. 15.)  BioScrip contends that such information is proprietary and confidential, and as such, that its potential use by Poller in her new employ was violative of her continuing fiduciary duties to BioScrip.  In response, Poller notes that BioScrip does not consider commission calculation sheet data as "competitively sensitive," as it emailed that same material to Poller at her AOL email address "in the ordinary course" on May 26, 2011, more than two months after Poller left the company.   (Response of Judy Poller and AOM to BioScrip's Local Rule 56.1, Dkt. No. 81 ("Pl.'s CSMF"), at ¶ 103.)

- Email 2: On March 3, 2011, at 9:08 p.m., Poller sent an email from her work account to her personal email, which constituted a forwarded message from Sanford Werther on March 3, 2011 containing a 9-page document titled "Judy Updates."  (Ex. 16.) This document included the referring doctor's name and telephone number, the patient name, the referral date, the dosage and type of care, patient insurance, the chronic care representative responsible for the corresponding source and patient, and included a space for extra comments.  (*Id.*)

- Email 3: On March 5, 2011, at 12:42 a.m., after she had sent her resignation but before BioScrip was aware of it, Poller forwarded to herself a February 17, 2011 email she had received from Sanford Werther reflecting a patient referred from Doctor Roger W. Kula for IVIG infusion.  (Ex. 17.)  AOM and Poller admit that the patient mentioned in that email was referred to AOM by Dr. Kula in September 2011.  (Pl.'s CSMF at ¶ 117.)  Poller asserts that her relationship with Dr. Kula predates her BioScrip employment. (*Id.*)

- Email 4: On March 5, 2011, at 12:57 a.m., Poller forwarded to her personal account a February 4, 2011 email she had received from

Stephanie Lapidow, a BioScrip authorization specialist.  (Ex. 18.) While Poller asserts that the email does not contain information respecting a new referral (Pl.'s CSMF at ¶ 118), the email reads, in pertinent part, as follows: "Attached you will find a new referral for Gammagard Liquid. . . . Nursing-I've been in contact with Maria at Homecare Specialist regarding this case.  Please call Maria to set up nursing visit . . . . Patient is cleared."  (Ex. 18.)

- Email 5:  On March 6, 2011, Poller emailed Dr. Zarnegar discussing information she needed for two patients before she could schedule them for IVIG therapy. In the email she also stated as follows: "I am now working with American Outcomes Management.  I will provide superior service to you and your patients.  I have enjoyed working with you and I will continue to make your patients a priority."  (Ex. 19.)

- Email 6:  On March 6, 2011, at 7:50 p.m., Poller emailed a nurse who works with an infertility group, concerning subcutaneous gammaglobulin.  In the email, Poller stated that she had "joined [AOM]" and would "be providing superior service to [Maria's] patients."  (Ex. 20.)  Poller claims that the patients referred to in the email were not BioScrip patients, but instead, were new patients she was soliciting on behalf of her new job with AOM.  (Ex. 37 at 288:7-289:3.)

- Email 7: On March 8, 2011, after Poller had officially begun work at AOM, Poller emailed one Dr. Scelsa and sent him an Intake Form and an IVIG order form, presumably for a new patient referral.  (Ex. 21.)

As discussed, Poller's resignation letter is dated March 4, 2011, but she did not place that resignation in the mail, via FedEx, until March 5, 201l.  No one at BioScrip, save her intake employee, learned of her resignation until March 7.  (Ex. A at 77:19-78:21.)  Thus, up until she mailed her resignation on Saturday, March 5, 2011, Poller was subject to all the standard fiduciary duties and duties of loyalty owed to an employer by an employee.  Accordingly, Emails 1-4 were all sent to Poller's personal account before her resignation.  With respect to Emails 1 and 2, the commission report and patient list, Poller's position is that BioScrip employees often worked from their personal computers, and that such lists were routinely exchanged and were not treated as confidential.  Additionally, Poller contends that she never had any intention of sharing

confidential patient information with AOM.  (*See* Ex. C at 241:5-242:14  ("The reason I have

this was that so I just know the patients and know how they should, you know, be taken care of.

And I have never used this; I have never shared information with anybody.").)  She also adds

that the forwarding of these four emails did not constitute an active effort to undermine BioScrip

while working with AOM.  Yet, the record does suggest that Poller intended to utilize the

information to some extent in her new capacity as an AOM employee.   For example, in

describing Email 3, Poller, during the preliminary injunction hearing, explained that she sent the

information to her personal email because "I wanted to have information—I wanted to know

information just about the doctors that I, you know, that I had brought in."  (Ex. 37 at 108:19-

21.)  Similarly, with respect to Email 4, Poller noted that she forwarded the information only so

that she would have access to information regarding her referral sources.  (*Id.* at 110:18-19 ("I

was not interested in any particular patients, just my doctors.").)

Thus, despite Poller's protestations to the contrary, there is at least an issue of material

fact as to whether she utilized some of the information in Emails 1-4—information, some of it

confidential, which she procured solely as a result of her employment with BioScrip and sent to

herself in the week leading up to her departure, arguably in preparation for her new position at

AOM.  For example, all parties agree that the patient mentioned in Email 3 became an AOM

patient in September 2011.  Moreover, the record reflects that at least some patients were

switched from BioScrip to AOM in the wake of Poller's resignation, and that those patients were

initially unaware of the provider change or confused by it, suggesting that some of Poller's

referral sources, perhaps referral sources whose information was memorialized in Emails 1-4,

may have moved with her to AOM.   For example, in an email sent from Poller to Margaret

Clarke, an AOM Patient Care Manager, on March 21, 2011, Poller wrote, concerning recent

referrals from three doctors whose names appear on the list in Email 3: "It is very important not

to call the patients until you speak with me.  Many of my referrals are being transitioned from

BioScrip.  These MDs trust me to handle these patients.  However, most of them are not aware

the MDs are changing companies."  (Ex. 26.)  Similarly, in a March 22, 2011 email, Yvonne

Coble, an AOM team manager, wrote: "Judy asked me to send this e-mail requesting her

patient's [sic] not be contacted until she give [sic] the ok.  Her patient's [sic] are in the process of

transferring to AOM and most have not been notified yet."  (Ex. 27.)  In that same vein, Coble

wrote that same day that "Judy is requesting someone from Team C contact [redacted patient

name] and notify him of the transfer to AOM.  Judy ask [sic] that you call her before contacting

[redacted patient name]."  (*Id.*)  Moreover, on April 15, 2011, Poller sent an email to Bo

Sanderson, an AOM case manager, regarding a patient of one Dr. Bronfin—a physician whose

information appears in Email 3—and that patient's switch to AOM.  (*See* Ex. 28 ("I just came

from the clinic and spoke to Dr. Bronfin.  Lilac,RN, will call pt. Around 2pm to tell her the MD

wants her to go with AOM!  I old [sic] MD we went out of our way to hire [redacted nurse

name] and she still does not want to change.  I also told MD that Bioscrip ignored her DC orders

and most likely serviced her in April.").)

Finally, it appears that there was some controversy at AOM with regard to the

transitioning of BioScrip patients to AOM and Poller's approach towards informing patients of

that transition.  For example, Poller wrote to Sanderson concerning an angry doctor whose

patient was transitioned to AOM before the physician had discussed the potential change in

chronic care servicer, stating:

> In regard to patient [redacted patient name], I received an angry
> note from Dr. Casarona today.  I had asked you this morning to be
> sure we do not proceed yet with auth. . . . Evidently Ashley had

> already gotten auth.  I had advised the MD that the insurance was
> good if he decided to treat the patient and transition her to AOM.
> He sent me back an unfavorable message. . . . Please be sure to
> have the staff follow my instructions or I will have to hold off
> sending new info in until they are to move forward.

(Ex. 29.)  In response to this email, Sanderson noted the existence of miscommunication

regarding patient transitions, writing:

> Judy, with the history of misfires on your pt's transition to AOM,
> maybe it is time you hold the referral until the MD and pt. is "on
> board" with the transfer.  It is uncommon for AOM to "hold"
> referrals.  AOM is geared to move forward with all referrals as
> soon as we get it into our system.  With our different teams, it is
> difficult to keep everyone in the loop because each case has some
> type of extenuating circumstances. [] With your physician's [sic]
> personalities and the sensitivity surrounding your referrals, maybe
> it is time, you only send the information when you have a definite
> plan of treatment.

(*Id.*)  In sum, the record reflects a dispute of material fact as to the extent to which information

Poller sent to herself from her BioScrip account in preparation for her departure to AOM was

intended for use in direct competition with BioScrip's business, thus constituting a breach of

Poller's duty of loyalty to BioScrip while in its employ.  *Cf. Delville v. Firmenich Inc*., 920 F.

Supp. 2d 446, 469 (S.D.N.Y. 2013) ("Defendant, however, has presented no evidence that

Firmenich's confidential or proprietary information was used by Delville to benefit his

subsequent employers.  Thus, Defendant's duty of loyalty claim fails as a matter of law."

(citations and footnote omitted)).

As for Emails 5 and 6, the correspondence does not appear to implicate confidential

information that Poller obtained through her employ with BioScrip, as required to trigger a

continuing fiduciary duty that survives resignation or termination.  Accordingly, any potential

use by AOM of information gleaned from the correspondence in Emails 5 and 6 cannot be said

38

to have been procured in breach of Poller's fiduciary duties or duty of loyalty. Therefore, any claims BioScrip may have deriving from those duties will necessarily stem from Emails 1-4, with respect to which there remains an issue of material fact.

Therefore, Poller's motion for summary judgment on Counts III and IV is denied.

### C.      Computer Fraud and Abuse Act (Count V)

BioScrip also asserts a claim under the Computer Fraud and Abuse Act ("CFAA") against Poller, alleging that she began work for AOM on March 4, 2011, and, without authorization, utilized her BioScrip laptop and email throughout the weekend in contravention of the CFAA. This claim lacks merit.

"The CFAA penalizes, *inter alia*, unauthorized access to protected computers with intent to defraud or cause damage." *Nexans Wires S.A. v. Sark-USA, Inc.*, 166 Fed. App'x 559, 561-62 (2d Cir. 2006) (footnote omitted) (citing 18 U.S.C. § 1030(a)). Some courts have construed "unauthorized access" to extend to access by employees to their work computers and emails after they have been terminated or resigned. *See, e.g.*, *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1136 (9th Cir. 2009) ("There is no dispute that if Brekka accessed LVRC's information on the LOAD website after he left the company in September 2003, Brekka would have accessed a protected computer 'without authorization' for purposes of the CFAA."); *Univ. Sports Pub. Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 385-86 (S.D.N.Y. 2010) ("All parties agree that if Pitta accessed the database after he left USP's employ in 2006, he did so 'without authorization.'"); *Hat World, Inc. v. Kelly*, No. Civ. S-12-01591, 2012 WL 3283486, at *6 (E.D. Cal. Aug. 10, 2012) ("[T]he court concludes that plaintiff has stated a claim under the CFAA by alleging facts from which the court can plausibly conclude that defendant exceeded his authorized access by continuing to access information stored on company computers and servers

after his resignation.").  However, "[n]o language in the CFAA supports [the] argument that authorization to use a computer ceases when an employee resolves to use the computer contrary to the employer's interest," so long as that individual still technically possesses the right of computer access pursuant to his employ.  *LVRC Holdings*, 581 F.3d at 1133.  In other words, exploitative or disloyal access to an employer's computer will not render otherwise permissible access unauthorized within the CFAA's meaning.  *See Univ. Sports Pub. Co.*, 725 F. Supp. 2d at 383 ("[A]n employee with authority to access his employer's computer system does not violate the CFAA by using his access privileges to misappropriate information." (citing cases)).[5]

While the CFAA is primarily a criminal statute designed to combat hacking, it includes a limited private right of action.  *See* 18 U.S.C. § 1030(g) ("Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief.").  The applicable statutory factor under which BioScrip asserts is claim is that delineated in § 1030(c)(4)(A)(i)(I): "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." The statute defines "loss" as follows:

> any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service....

---

[5] The Circuits are split on this issue, with the First, Fifth, Seventh, and Eleventh Circuits interpreting "exceeds authorized access" as encompassing the situation where an employee misuses information that he was technically permitted to access, and the Fourth and Ninth Circuits interpreting the statute narrowly.  The district courts in the Second Circuit are also divided.  *See JBCHoldings NY, LLC v. Pakter*, No. 12 Civ. 7555 (PAE), 2013 WL 1149061, at *5 (S.D.N.Y. Mar. 20, 2013) (discussing split and adopting narrow approach based on plain language of the statute).

18 U.S.C. 1030(e).  Courts have interpreted this provision to limit lost revenue to those losses attributable to an interruption of service.  *See, e.g.*, *Nexans*, 166 Fed. App'x at 562 ("As the district court correctly recognized, the plain language of the statute treats lost revenue as a different concept from incurred costs, and permits recovery of the former only where connected to an 'interruption in service.'" (citations omitted)); *accord Civic Ctr. Motors, Ltd. v. Mason Street Import Cars, Ltd.*, 387 F. Supp. 2d 378, 382 (S.D.N.Y. 2005) ("In the instant case, Plaintiffs are seeking compensation for lost profits resulting from Defendant's unfair competitive edge and for their now wasted investment in the development and compilation of the database information.  However, neither of these kinds of losses are the result of computer impairment or computer damage.  Therefore, they are not compensable 'losses' under the CFAA."); *Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238, 252 n.12 (S.D.N.Y. 2000) ("Although lost good will or business could provide the loss figure required under § 1030(a)(5)(C), it could only do so if it resulted from the impairment or unavailability of data or systems.  The good will losses cited by Register.com are not the result of the harm addressed by § 1030(a)(5)(C)." (construing earlier version of current statute)).

Here, BioScrip alleges two kinds of damages stemming from Poller's alleged unauthorized access of her BioScrip laptop: (1) the March 5 use of Poller's computer to access her BioScrip email to send BioScrip information reportedly pertaining to two new patient referrals (Emails 3 and 4, mentioned above); and (2) the monetary expenditures incurred by BioScrip in hiring a forensic expert to examine Poller's laptop after she purportedly "wiped" it of all information.  With respect to Emails 3 and 4, even assuming that Poller's use was "unauthorized" within the meaning of the statute, the supposed lost revenue or business associated with the two potential referrals in those emails cannot be said to have been caused by

an interruption of service, as required by the plain language of the CFAA.  There is nothing

about the forwarding of Emails 3 and 4 that constitutes the "impairment or unavailability of data

or systems." *Register.com*, 126 F. Supp. at 252 n.12.  Second, "under the case law interpreting

[the CFAA] from within this circuit, the costs of investigating security breaches constitute

recoverable 'losses,' even if it turns out that no actual data damage or interruption of service

resulted from the breach," *Univ. Sports Pub. Co.*, 725 F. Supp. 2d at 387 (citations omitted), and

it is clear that BioScrip has provided evidence that it spent approximately $6,000.00 in its

retention of UHY Advisors FLVS. Inc., a company specializing in digital forensics and

eDiscovery, to "assist in analyzing the laptop that Ms. Poller returned on March 7, 2011."

(Saracco Decl. at ¶ 3; *id.* at Ex. 1.)  BioScrip contends that over the course of the weekend from

March 4 through March 7, Poller "wiped" her computer of tens of thousands of BioScrip

documents, in addition to forwarding BioScrip information to herself.  (Pl.'s CSMF at ¶ 113; *see*

*also* Ex. 37 at 222:6-226:1.)  The reported "wiping" of Poller's computer, scrubbing it of what

BioScrip contends constituted 30,000 documents, is presumably the "damage assessment" or

data restoration BioScrip advances as a "reasonable cost," collectable under the CFAA.  The

circumstances surrounding the transfer and deletion of this information, however, raise questions

as to whether it fits within the ambit of the CFAA.

As noted, the CFAA only encompasses damages or loss associated with *unauthorized*

access of a computer.  However, where an employee has certain access to a computer or system

associated with her job, that access will be construed as unauthorized within the meaning of the

CFAA only where it occurs after the employee is terminated or resigns.  *See, e.g.*, *Orbit One*

*Commc'ns, Inc. v. Numerex Corp.*, 692 F. Supp. 2d 373, 385 (S.D.N.Y. 2010) ("[R]eading the

phrases 'access without authorization' and 'exceeds authorized access' to encompass an

employee's misuse or misappropriation of information to which the employee freely was given access and which the employee lawfully obtained would depart from the plain meaning of the statute."); *accord JBCHoldings*, 2013 WL 1149061, at *5  ("This Court finds the narrow approach to be considerably more persuasive: When an employee who has been granted access to an employer's computer misuses that access, either by violating the terms of use or by breaching a duty of loyalty to the employer, the employee does not 'exceed authorized access' or act 'without authorization.'").

Here, Poller's last day of work at BioScrip was March 4, 2011.  She originally attempted to resign from BioScrip that day, but returned to FedEx to mail her resignation letter, along with her laptop and BioScrip phone,[6] on Saturday, March 5, 2011, having arrived too late in the evening to send her letter on March 4.  BioScrip received notice of Poller's resignation on Monday, March 7, when it received her resignation letter, together with her laptop and phone. As previously discussed, Poller remained a BioScrip employee until she mailed her resignation to her employer on Saturday, March 5, 2011.  While March 4, 2011 was technically her last day at BioScrip, a written resignation that remains unsent cannot, alone, effect a resignation.  Had Poller written her resignation, never sent it, and continued to work at BioScrip, whatever her intentions prior to and while writing that resignation, she would not have resigned her position, nor could any computer access associated with that BioScrip employment, while potentially disloyal or in breach of her RCA, have constituted an actionable wrong under the CFAA—as her access would have remained "authorized" within the meaning of the statute.  Since Poller sent

---

[6] Poller's resignation letter to Saracco read as follows: "Dear Michael, Enclosed please find the Bioscrip computers, Blackberries and accessories.  As of March 4, 2011, I have resigned my position at Bioscrip Infusion.  I have sent my outstanding expenses to Brenda Vasquez."  (Ex. 11.)

her resignation letter to BioScrip along with her BioScrip laptop, and thus, did not access her

BioScrip computer or email, or "wipe" that computer subsequent to the mailing of her

resignation, she did not violate the CFAA, as her access, though potentially disloyal or a breach

of her employment agreement, was authorized within the meaning of the CFAA.

Accordingly, Poller's motion for summary judgment on BioScrip CFAA claim is granted.

### D.      Unfair Competition (Count VI)

BioScrip asserts an unfair competition counterclaim against Poller and AOM, contending

that Poller and AOM "misappropriated BioScrip's labors, expenditures and good will."  (Def.'s

Rep. 26.)  The parties have cross-moved for summary judgment on this counterclaim.

"Common law unfair competition is 'a broad and flexible doctrine . . . [that] is adaptable

and capacious.'"  *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 446 (E.D.N.Y. 2011)

(quoting *Roy Export Co. Establishment v. Columbia Broad. Sys. Inc.*, 672 F.2d 1095, 1105 (2d

Cir. 1982) (alteration in original)).  "The law of unfair competition in New York encompasses a

broad range of unfair practices."  *CA, Inc. v. Simple.com, Inc.*, 621 F. Supp. 2d 45, 52 (E.D.N.Y.

2009) (citations omitted).  And while the doctrine is flexible, it is not "limitless," with its

"essence" being that the "defendant misappropriated the fruit of plaintiff's labors and

expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or

an abuse of a fiduciary or confidential relationship."  *Telecom Intern. Am., Ltd. v. AT&T Corp.*,

280 F.3d 175, 197 (2d Cir. 2001) (quotations and citations omitted); *see also Delville*, 920 F.

Supp. 2d at 470-71 (citing cases).  Even where a party benefits from another's research,

development, and labor, however, "absent some appropriation of an idea or knowledge in which

[the laboring party] had a property interest or a contractual arrangement creating such an

interest," an unfair competition claim will not lie.  *Telecom*, 280 F.3d at 198.

First, the claim fails as to AOM, as there is no record evidence that AOM misappropriated—or wrongfully took—BioScrip's "labors, expenditures, or goodwill."  Even if AOM benefited from Poller's purported misappropriation, it did not play a role in that taking, other than to offer Poller a position in the first instance.  Second, as for Poller, the Court has already determined that there are genuine issues of fact as to whether Poller took confidential information associated with her work with BioScrip—information that was perhaps painstakingly compiled by BioScrip employees—and whether that information was utilized by her to solicit referral sources and patients while at AOM.  And while Poller contends that there is no evidence of "bad faith," as required by a successful unfair competition claim, the Court disagrees.  There is sufficient evidence, albeit circumstantial, that Poller, if she is deemed to have misappropriated BioScrip's labors, did so in less than good faith.  The circumstances surrounding her departure from BioScrip, together with the timing of her information transmission, resignation, and alleged computer-wipe, are all those from which a reasonable jury could infer bad faith.  Accordingly, genuine disputes of material fact remain with respect to BioScrip's unfair competition claim against Poller.

AOM also asserts an unfair competition counterclaim against BioScrip (Dkt. No. 31 at ¶¶ 154-56), contending that "BioScrip has engaged in unfair competition, violated industry standards and violated HIPAA by unlawfully using [patient health information] that was provided by treating physicians solely for the purpose of patient care."  (*Id.* at ¶ 155.)  However, there is no evidence in the record to support this claim, nor does AOM oppose BioScrip's motion for summary judgment on these grounds.  Thus, BioScrip's motion for summary judgment on AOM's unfair competition claim is granted.

### E.     Misappropriation of Trade Secrets (Count VII)

BioScrip contends that Poller misappropriated BioScrip's trade secrets, imparting AOM with a competitive advantage that it exploited upon Poller's hiring.  Poller and AOM have moved for summary judgment on this claim.

"A plaintiff claiming misappropriation of a trade secret must prove that: (1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means."  *Delville*, 920 F. Supp. 2d at 470 (quotations and citations omitted).  With respect to AOM, BioScrip's claim suffers from the same infirmity as Count VI—namely, there is no indication from the record that AOM misappropriated any of BioScrip's proprietary information.  Accordingly, Poller and AOM's motion for summary judgment on Count VII is granted as to AOM.  Regarding Poller, as discussed, there is an issue of material fact as to whether the information Poller took from her BioScrip laptop was protectable as a trade secret.  Similarly, there remains a dispute as to whether and to what extent she used this information once at AOM.  Therefore, Poller and AOM's motion for summary judgment on BioScrip's misappropriation claim is granted as to AOM, but denied as to Poller.

### F.     Unjust Enrichment (Count VIII)

BioScrip contends that Poller's misappropriation of BioScrip's proprietary information unjustly enriched both herself and AOM, her new employer, at BioScrip's expense.  AOM and Poller have moved for summary judgment, arguing that (1) the claim is too attenuated with respect to AOM; and (2) BioScrip's breach of contract claims preclude such equitable relief.

 "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good

conscience' require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (citation omitted). "To plead a plausible claim to relief on a theory of unjust enrichment, plaintiffs must show a causal nexus between a defendant's enrichment and their own expense that goes beyond mere correlation." *St. John's Univ., New York v. Bolton*, 757 F. Supp. 2d 144, 182 (E.D.N.Y. 2010) (quotations and citations omitted). It is true that unjust enrichment constitutes a "quasi-contract viable only in the absence of an enforceable agreement between the parties governing the subject matter of the dispute." *Id.* at 183. However, where there is a "bona fide dispute as to the existence of a contract, or where the contract does not cover the dispute in issue, a plaintiff may proceed upon a theory of quasi contract as well as contract, and will not be required to elect his or her remedies." *Zuccarini v. Ziff-Davis Media, Inc.*, 306 A.D.2d 404, 405 (2d Dep't 2003) (citations omitted); *accord Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 388-89 (Ct. App. 1987) ("It is impermissible, however, to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." (citations omitted)).

Here, AOM and Poller contend that the RCA, which BioScrip asserts is valid, explicitly encompasses the core of BioScrip's unjust enrichment counterclaim, and as such, bars a claim in quasi-contract. However, there remain issues of material fact as to the existence of a remedy at law for Poller's actions. For example, if the information acquired by AOM is deemed unworthy of trade secret protection, the non-compete provision of the RCA would be unenforceable, as it would lack the requisite "legitimate interest." Regardless of whether the information warrants trade secret protection, however, it is possible that Poller and AOM benefited, at BioScrip's expense, from the use of the information, and that equity and good conscience might require

restitution.  Accordingly, BioScrip's unjust enrichment claim may stand in the alternative to its contractual claims.  Thus, AOM and Poller's motion with respect to this counterclaim is denied.

### G.    Tortious Interference with Contractual Relations and Prospective Business Advantage (Count IX)

BioScrip asserts claims for tortious interference with contractual relations and prospective business advantage against Poller and AOM, contending that Poller and AOM used unfair or improper means in soliciting Poller's former referral sources and patients.  Poller and AOM have moved for summary judgment on both the tortious interference with prospective business interference claim and the interference with contractual relations claim, the latter of which BioScrip has not contested.

To state a claim for tortious interference with prospective business advantage in New York, "four conditions must be met: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship."  *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008) (Sotomayor, J.) (citations omitted); *accord Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (same).  "While a defendant's commission of a 'crime or an independent tort' clearly constitutes wrongful means, such acts are not essential to find wrongful means."  *Catskill*, 547 F.3d at 132 (citations omitted).  The definition of wrongful means under New York law does tend to include however "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure."  *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 206 (2d Cir. 1998) (quotations and citations omitted).  Importantly, "[a] knowing breach of fiduciary duty may also, if it satisfies the usual common law elements, amount to a fraud or

misrepresentation."  *Id.* (citations omitted); *see also Friedman v. Coldwater Creek, Inc.*, 551 F. Supp. 2d 164, 170 (S.D.N.Y. 2008), *aff'd*, 321 Fed. App'x 58 (2d Cir. 2009) ("[F]or Defendants' interference to constitute the kind of 'wrongful means' that will support Plaintiff's claim for tortious interference, one of the following must be true: (1) that conduct must amount to an independent crime or tort; (2) that conduct must have been taken solely out of malice; or (3) that conduct must amount to 'extreme and unfair' economic pressure." (citations omitted)).  In order to prevail on such a claim, a plaintiff must "demonstrate *both* wrongful means *and* that the wrongful acts were the *proximate cause* of the rejection of the plaintiff's proposed contractual relations."  *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 171-72 (2d Cir. 2004) (quotations and citation omitted) (emphasis in original).

Here, Poller and AOM contend that BioScrip has failed to adduce any record evidence that points to improper means and the requisite causation.  The Court disagrees.  As previously discussed, there is an issue of material fact as to whether Poller breached her fiduciary duty to BioScrip in the appropriation of certain information around the time of her departure from work there.  Moreover, there is an issue of material fact with respect to whether AOM and Poller utilized this information to gain a business advantage, causing BioScrip to lose referral sources and patients.  Since a knowing breach of fiduciary duty may constitute the wrongful means contemplated by a New York tortious interference with prospective economic advantage claim, and given the issues of material fact surrounding AOM's subsequent use of the information procured by Poller from her time at BioScrip, the cross-motions on this claim are denied.

### H.    New York General Business Law § 349 (Count X)

BioScrip contends that Poller and AOM's actions have violated New York General Business Law § 349, arguing that Poller and AOM have misled patients into changing their IVIG

service from BioScrip to AOM.  In response, Poller and AOM have moved for summary

judgment, asserting that New York's General Business Law ("GBL") does not apply to private,

contractual disputes such as the one at issue here.

"Section 349 (a) of the General Business Law declares as unlawful '[d]eceptive acts and

practices in the conduct of any business, trade or commerce or in the furnishing of any service in

this state . . . .'"  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85

N.Y.2d 20, 24 (Ct. App. 1995).  Section 349 provides a private right of action for "'any person

who has been injured by reason of any violation of this section,' allowing injunctive relief and

damages, as well as reasonable attorney's fees."  *Id.* (quoting N.Y. G.B.L. § 349[h]).  "To

establish a *prima facie* case for a claim of deceptive trade practices under N.Y. GBL § 349, a

claimant must allege that: '(1) the defendant's deceptive acts were directed at consumers, (2) the

acts are misleading in a material way, and (3) the plaintiff has been injured as a result.'"  *Gucci*

*Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 273 (S.D.N.Y. 2003) (citations

omitted).  With respect to the "consumer-oriented" aspect of a § 349 claim, "[c]onsumer-oriented

conduct 'need not be repetitive; or recurring but defendant's acts or practices must have a broad

impact on consumers at large.'"  *Koch v. Greenberg*, No. 07 Civ. 9600 (BSJ), 2008 WL

4450273, at *5 (S.D.N.Y. Sept. 30, 2008) (quoting *N.Y. Univ. v. Continental Ins. Co.*, 87 N.Y.2d

308, 320 (Ct. App. 1995)).  Conduct will be said to have a broad impact wherever "the acts

complained of 'potentially affect similarly situated consumers.'"  *Id.* (quoting *Oswego*, 85

N.Y.2d at 26).  In contrast, where an alleged harm is associated with a private contractual

dispute, it will fail to fall within the ambit of § 349.  *See Gucci*, 277 F. Supp. 2d at 273

("Commercial claimants under § 349 must allege conduct that has 'significant ramifications for

the public at large' in order to properly state a claim." (citations omitted)).  As for the other two

elements of this GBL claim, "[d]eceptive acts are defined objectively [ ] as acts likely to mislead a reasonable consumer acting reasonably under the circumstances," *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (quotations and citation omitted), and "[i]n addition, a plaintiff must prove 'actual' injury to recover under the statute, though not necessarily pecuniary harm," *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (Ct. App. 2000) (citations omitted).

Here, BioScrip cites Poller and AOM's "repeated unsolicited telephone calls" as the "deceptive means" that have caused BioScrip's IVIG patients to switch their chronic care provider to AOM. (Def.'s Mem. at 38.) BioScrip adds that the fact that it is not a "consumer" does not bar it from recovery under the GBL, as "[b]usinesses indirectly injured by deceptive conduct, as well as consumers, are afforded a private right of action against fraudulent businesses." (*Id.*) While BioScrip is correct that a GBL plaintiff need not be a consumer in order to bring a legitimate § 349 claim, it ignores the requisite consumer-oriented element of a successful action under this statute. At its core, § 349 is a consumer protection statute, which means the conduct at issue must be directed at consumers at large. *See, e.g.*, *Wiener v. Unumprovident Corp.*, 202 F. Supp. 2d 116, 120 (S.D.N.Y. 2002) ("The sale of a standard form insurance policy has been held to constitute such consumer oriented conduct under this statute." (citations omitted)). The type of harm alleged here is not one that fits within the ambit of § 349. First and foremost, there is no record evidence that suggests that AOM's alleged solicitation of BioScrip's patients constituted conduct directed at the consuming public at large. If anything, the alleged contact with patients was highly individualized and specific. Similarly, there is no suggestion that AOM had a standard approach to the consuming patient public at large. Additionally, while BioScrip alleges in a blanket assertion that AOM and Poller contacted patients in a deceptive manner, engaging in unsolicited phone calls that involved misinformation,

51

there is no record evidence of such activity or patient contact.  Accordingly, this claim fails and Poller and AOM's motion for summary judgment on the § 349 counterclaim is granted.

### I.     Permanent Injunctive Relief

In its initial Answer, BioScrip asserted a counterclaim for permanent injunctive relief.  However, at this juncture, all parties appear to concede that as Poller has been working for AOM since 2011, the case now encompasses damages rather than injunctive relief.   (*See* Pl.'s Rep. at 29; Def.'s Mem. at 24 ("Finally, at this stage of the proceedings, BioScrip is not seeking to prevent Poller from working for AOM—it is seeking only monetary damages.").)

Accordingly, Poller and AOM's motion for summary judgment on this claim is granted.

### J.     Punitive Damages

Finally, BioScrip asserts that punitive damages are warranted in this case, contending that Poller and AOM's conduct may justify such a finding.  Poller and AOM have moved for summary judgment on this claim, asserting that no reasonable jury could find that their conduct was "gross, wanton, or willful," as required under New York law.

It is well settled that "[t]o obtain punitive damages in ordinary tort actions, a New York plaintiff must show that the defendant committed a tort under 'circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton.'"  *Barbagallo*, 820 F. Supp. 2d at 448 (quoting *Prozeralik v. Capital Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479 (Ct. App. 1993)).  Punitive damages are designed to "punish the tortfeasor and to deter th[e] wrongdoer and others similarly situated from indulging in the same conduct in the future."  *Id.* (quoting *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 489 (Ct. App. 2007) (quotations omitted)).  "It is not essential that the plaintiff allege a pattern of

conduct directed at the public in general to assert a claim for punitive damages." *Pure Power*, 813 F. Supp. 2d at 526 (citations omitted).  However, it is "necessary to allege fraud that is founded upon such moral indifference as to be 'aggravated by evil' or to be demonstrative of a criminal indifference to civil obligations." *Rush v. Oppenheimer & Co., Inc.*, 596 F. Supp. 1529, 1532 (S.D.N.Y. 1984).  In sum, "[t]he conduct for which courts generally award punitive damages is that which is "close to criminality," being variously described as 'utter recklessness,' 'reckless and of a criminal nature,' 'wanton or malicious,' and 'gross and outrageous.'" *Dubai Bank, Ltd., New York Branch v. Joshi*, No. 85 Civ. 5005 (MJL), 1989 WL 168088, at *4 (S.D.N.Y. Aug. 29, 1989) (citations omitted).

Here, even if BioScrip ultimately prevails on all of its remaining counterclaims, there is no record evidence from which a jury could reasonably find that Poller's or AOM's actions exhibited such utter recklessness as to warrant punitive damages.  At most, Poller has breached her fiduciary obligations to her former employer, permitting her new employer to unfairly and unjustly benefit from BioScrip's labors.  And while Poller violated her HIPAA obligations if she indeed shared patient information with AOM, as alleged by BioScrip, there is no evidence to suggest that patients were harmed, received deficient care, or had their information circulated or published beyond their chronic care providers.  Poller's conduct may have been questionable and harmful to BioScrip's business; nevertheless, punitive damages are limited to the most egregious of cases.  And here, at most, BioScrip has suffered the ill effects of several business torts, which can be remedied by compensatory damages.

Accordingly, Poller and AOM's motion for summary judgment on the remedy of punitive damages is granted.

**IV.      Conclusion**

For the foregoing reasons, the parties' motions for summary judgment are granted in part and denied in part:

Poller's motion for summary judgment and BioScrip's cross-motion on Poller's declaratory judgment claim are DENIED.

Poller's motion for summary judgment on the enforceability of the RCA; breach of contract (Counts I and II); breach of fiduciary duty and the duty of loyalty (Counts III and IV); unfair competition (Count VI); misappropriation of trade secrets (Count VII); and unjust enrichment (Count VIII) claims is DENIED.

AOM's motion for summary judgment on the unfair competition (Count VI) and misappropriation (Count VII) claims is GRANTED; and AOM's motion for summary judgment on the unjust enrichment claim (Count VIII) is DENIED.

Poller and AOM's motion for summary judgment on BioScrip's tortious interference with business relations claim (Count IX) is DENIED; Poller and AOM's unopposed motion for summary judgment on BioScrip's tortious interference with contractual relations claim is GRANTED.

Poller and AOM's motion for summary judgment on BioScrip's Computer Fraud and Abuse Act (Count V) and New York General Business Law (Count X) counterclaims is GRANTED.

Poller and AOM's motion for summary judgment on BioScrip's request for punitive damages and for permanent injunctive relief is GRANTED.

BioScrip's motion for summary judgment on Poller's declaratory judgment claim, and on its breach of contract (Counts I and II) and unfair competition (Count VI) claims, is DENIED.

54

BioScrip's motion for summary judgment on AOM's unfair competition claim is

GRANTED.

The Clerk of Court is directed to close the motions at docket entry numbers 66 and 74.

SO ORDERED.

Dated:  New York, New York
        September 25, 2013

_____
              J. PAUL OETKEN
        United States District Judge

55